[Civ. No. 2428. Fourth Appellate District.—August 21, 1939.]

L. P. FELDMEIER et al., Plaintiffs and Respondents, v. MORTGAGE SECURITIES, INCORPORATED, OF SANTA BARBARA (a Corporation), et al., Defendants and Respondents; SECURITY TITLE INSURANCE AND GUARANTEE COMPANY (a Corporation) et al., Defendants and Appellants; ALICE W. JACKSON, Intervener and Respondent.

Heaney, Price, Postel & Parma, Clarence A. Rogers and Warner Edmonds, Jr., for Appellant Security Title Insurance and Guarantee Company.

T. H. Canfield and Webster & Lyon for Appellant Reinert.

Morin, Newell, Brown & Hamil for Plaintiff and Respondent.

J. F. Goux and E. W. Squier for Defendant and Respondent Mortgage Securities, Incorporated, of Santa Barbara.

Griffith & Thornburgh for Respondent County National Bank and Trust Company of Santa Barbara.

T. H. Canfield for Intervener and Respondent.

HAINES, J., *pro tem.*—The record in this case is a ponderous one. The pleadings begin with a complaint on the part of L. P. Feldmeier and others, who are respondents here, to enforce what they deem to be their rights as the holders of mortgage certificates issued by defendant and respondent Mortgage Securities, Incorporated, of Santa Barbara, to which, following the designation adopted in the findings of the trial court we shall hereinafter, for convenience, refer as the "Company". The defendants include also appellant Security Title Insurance & Guarantee Company, the assignee of certain assets deposited with it to secure the said certificates, to which, following again the designation used by the trial court in its findings, we shall hereinafter refer as the "Depositary". Sundry recognized holders of mortgage certificates, who are respondents here, were named in the complaint as defendants together with appellant Jane V. Reinert, who figures largely in the case as the claimant of certain further mortgage certificates, purporting to be issued by the Company, but found by the trial court to be void, and County National Bank and Trust Company of Santa Barbara, as pledgee of the certificates last referred to. Three successive additional pleadings designated as amendments and supplements to the complaint were filed. Answers were in due course filed by the Company, the Depositary, Jane V. Reinert, the County National Bank and Trust Company of Santa Barbara and various other defendants. A complaint in intervention was filed by Alice W. Jackson asserting title to one of the mortgage certificates which was answered by the plaintiffs and certain of the defendants. A cross-complaint was filed by Jane V. Reinert in which her claims were set up. A cross-complaint in which the Company and sundry

individual certificate holders named as defendants in the plaintiffs' pleadings joined was filed, in which most of the other parties to the action were made cross-defendants, as were a number of new parties included by order of the court, among whom was Fred D. Jackson and Alice *P.* Jackson. A further cross-complaint for declaratory relief was filed by the Depositary, in which Jane V. Reinert, Associated Almond Growers of Paso Robles, a corporation, County National Bank and Trust Company and various others were made cross-defendants, and this cross-complaint was later amended. These several cross-complaints were answered by most of the parties named therein as cross-defendants. Sundry parties were served with pleadings and, having failed to respond to them, are in default. We shall not attempt to restate at large the contents of these various pleadings. Suffice it at this point to say that they fill the greater part of the three large volumes making up the clerk's transcript. We shall, in proceeding to discuss the case, make such allusions to them as the situation requires.

The original complaint appears to have been filed in December, 1933, but various delays attended the making up of the issues and bringing the cause to trial, and the trial itself was prolonged and various continuances found necessary so that findings were not signed and filed until October 2, 1937. On the same day the judgment was rendered and on October 6, 1937, entered. From this judgment two appeals have been taken and are now before us, one by the said Jane V. Reinert and the other by the Depositary, Title Insurance and Guarantee Company.

The said Mortgage Securities, Incorporated, of Santa Barbara, referred to as the "Company" and the said Security Title Insurance and Guarantee Company, above and hereinafter referred to as the "Depositary", were, at all of the times here involved, California corporations, the latter being authorized by its articles to transact the business of a title insurance and guarantee company, though there seems to be no evidence in the record as to whether or not it was generally authorized to act as a depositary or trustee. However that may be, there was in fact executed on January 24, 1925, pursuant to a permit of that date issued by the state commissioner of corporations, a contract in the court's findings and hereafter described as the "Indenture" dated back as of October 6, 1924, between said two corporations, reciting that

the Company had assigned to the Depositary certain notes and the debts evidenced thereby, secured by mortgages or deeds of trust and proposed thereafter to assign to the Depositary other notes and the debts evidenced thereby, in each case to be accompanied by certified guarantees, abstracts of title or policies of title insurance, evidencing that said mortgages or deeds of trust should be first liens upon the property therein described, and also be accompanied by proper indorsements and assignments of the instruments evidencing the security for such notes and debts, with the policies of fire insurance covering the improvements on the properties involved, which insurance the Company covenanted to keep in effect. It was agreed that the unpaid balance in each case should amount to not more than 40 per cent of the appraised value of the property by which the debt should be secured. The purpose of these transactions according to the recital in the Indenture was to facilitate "sales by the Company of parts or shares of said securities to be evidenced by mortgage certificates, each certificate representing such part or share as may be in such certificate described, said certificates evidencing the ownership by such purchasers of undivided parts or shares respectively in said securities". It was further recited that in executing the Indenture each of the parties respectively represented "all parties in privity with them or either of them". It was agreed that the Company had executed and would execute assignments of the securities and that the Depositary had accepted and would accept the title thereto "for the benefit and account of the Company and each and every person or corporation that may be or become the owner of an undivided part" of said securities. The Company was to reserve and have the right "to sell undivided parts or shares of said securities and to issue and deliver to the purchasers of such parts or shares, respectively, mortgage certificates each representing a part or share of the whole of said securities equal to the proportion which the purchase price named in the certificate issued therefor respectively is of the total amount of said securities". The form of mortgage certificate contemplated was set out in the agreement. This form of certificate contained *inter alia* the following stipulation:

"The Company reserves the right to collect the interest of said securities and to receipt therefor, but of the interest

money received by it the Company will pay semiannually, on the first days of March and September in every year, to the registered holder thereof, a sum equal to —% of said purchase price from the date hereof until ——— and thereafter a sum equal to —% of said purchase price, and it shall retain as its own all interest collected on the part or share of said securities represented by this certificate in excess of the part of said interest to be so paid to the registered holder hereof.''

Provision was, in the form of certificate, made for the repurchase at certain times and upon certain notice, by the Company from the individual investor at the option of either of any such mortgage certificate or certificates ''for a sum equal to said purchase price, together with the registered holder's share of all interest accrued on the securities from the date of this certificate, less all payments made prior to the consummation of said purchase to any registered holder of this certificate . . . on account of collection of principal or interest under any of the securities . . . ''.

The Indenture went on to provide that each certificate issued in accordance with its terms ''must be authenticated over the signature of an officer of the Depositary'' and that the form of authentication should be substantially as follows:

''Authentication

''This certifies that the within is one of a series of first mortgage certificates issued by Mortgage Securities, Incorporated of Santa Barbara, under the escrow agreement therein referred to, and that as depositary under said escrow agreement, the undersigned holds the securities referred to in the within certificate in the proportion of One Hundred Ten Dollars of said securities for each One Hundred Dollar interest as represented by this certificate; said securities being held in accordance with and subject to the terms and conditions of said agreement.

''SECURITY TITLE INSURANCE AND GUARANTEE COMPANY

''By ————————————

''Assistant Secretary.''

The Indenture provided that:

''The depositary shall keep a book of registry and account which will show at all times the names and addresses of the persons to whom, the time when, and the purchase price for which, all Mortgage Certificates are issued in accordance with

this agreement; and the aggregate amount of the purchase price named in Mortgage Certificates outstanding at any one time shall not exceed the sum of Two Hundred and Fifty Thousand Dollars.

"It will be the duty of the depositary to authenticate, on demand of the company, Mortgage Certificates as described herein in conformity with the terms and conditions of this agreement."

The Company was, by the further terms of the Indenture entitled to present to the Depositary for cancellation any mortgage certificates previously issued and authenticated and to issue and have authenticated in their place others in lieu of those so surrendered. By the terms of the Indenture (article VI) the Company reserved to itself, so long as it was not in default the right and power:

"(a) To collect the interest of said securities and to receipt therefor.

"(b) To decide when and how any provision of any of said securities shall be enforced and of enforcing it accordingly.

"(c) To extend or change the time of payment of any of said securities.

"(d) To substitute or exchange other securities for the securities deposited with, or for money paid to, the depositary, as provided for in the next Article."

With respect to the substitution of securities the Indenture provided as follows:

"If the company, for any reason, desires to exchange any of said securities, substituting others therefor, written notice of its desire shall be given to the depositary, and the company shall deposit with the depositary other securities of such amounts as may be necessary, provided that after such substitution is completed the aggregate unpaid principal amount due on all secured notes, which shall constitute the collateral security for the Mortgage Certificates, shall not at any time be less than one hundred ten (110) per cent of the aggregate par or face value of the Mortgage Certificates issued and outstanding; and of like kind, similarly assigned, similarly protected by fire insurance, and accompanied by Certificates, Guaranties or Abstracts of Title or Policies of Title Insurance evidencing that said mortgages or deeds of trust are first liens upon the property therein described and do properly secure the payment of the notes described therein respectively, provided, however, that no security shall be

accepted by the depositary in consummation of any such substitution or exchange, unless the same shall be of such class and character that the company might at the time invest its capital or accumulations therein consistent with the laws which shall be then in force in this State as well as with the laws now in force therein; thereupon the company shall be entitled to make the desired exchange and substitutes, receiving such written transfer or conveyance from the depositary as may be necessary to transfer to the company complete title to the securities so withdrawn. Said securities so substituted shall be and become subject to the provisions of this agreement, the securities so withdrawn being thereafter not subject to the provisions of this agreement or of any certificate issued thereunder.''

All securities deposited from time to time by the Company with the Depositary were to be accompanied by schedules giving certain detailed information about the same and it was agreed (in article VII) that:

''At the time of the deposit of such securities covered by any such schedule, there shall be filed therewith an affidavit to be appended to said schedule or schedules and signed by the President or Vice President and Secretary or Assistant Secretary of the company, to the effect:

''1. That the said securities are, in the opinion of said officers absolute securities for the amount then owing thereon;

''2. That no interest is delinquent upon any securities and that all taxes and assessments and charges of every kind against the property described in such securities, which are due and payable, have been paid;

''3. That the indebtedness *then* owing upon each of said securities, as set forth in said schedule, is the correct amount of said indebtedness, and it is the *bona fide* debt for full value received;

''4. That an appraisement of the property encumbered by said securities has been made by the appraiser appointed herein, or his successor, and that the property is ample and sufficient security for the then unpaid and outstanding principal amount owing thereon.''

The Company reserved the right, subject to the approval of the corporation commissioner to name its own appraisers.

The Company agreed in the event that securities deposited by it should go into default, that it would upon certain notice substitute others ''so that the total unpaid and out-

standing principal amount of the securities shall, at all times be not less than one hundred ten (110) per cent of the face or par value of all of the outstanding Mortgage Certificates''.

The Indenture stipulated (in article X) that the happening of any of the following events should constitute a default on the part of the Company:

''(1) The failure of the company to pay at its office in Santa Barbara, to the registered holder of any of said Mortgage Certificates out of the interest received, the sum or amount to which said registered holder is entitled in accordance with the terms of the certificate held by him, such failure continuing for a period of ten (10) days after the date on which said sum should be paid in accordance with the terms of said certificate and after written demand on the company and notice to the depositary by said registered holder that said payment be made.

''(2) The failure of the company to purchase any of said Mortgage Certificates when required by the registered holder thereof, in accordance with the terms of said certificates, said failure continuing for a period of ten (10) days after written demand on the company and notice to the depositary by said registered holder.

''(3) The failure of the company to fully and promptly perform every or any obligation imposed upon it or assumed by it under the terms, and in accordance with the provisions of this agreement, said failure continuing for a period of thirty (30) days after written notice thereof or in regard thereto given by the depositary to the company.''

It is provided that in case of a default, and upon certain notice from the Company to the Depositary, the Company ''shall relinquish and be divested of all its rights and powers specified and reserved under article VI hereof'' (that is, its right to collect interest, to make determinations respecting the enforcement of the secured obligations deposited, to extend the times for the payment thereof and to substitute other securities for those deposited), ''and of any interest it may have in said securities'' (with certain exceptions not of present importance), ''and the Depositary shall, in such case be vested with all the rights and powers of the Company so relinquished by it and shall hold the securities as herein described for the account and benefit of the Company and the registered holders of the mortgage certificates then outstanding hereunder as their respective interest may appear,

and the Depositary and not the Company shall be the agent of the Company and the registered holders of said certificates for the purpose of collecting the interest accruing on said securities and of discharging, satisfying, enforcing, foreclosing and extending or anticipating time of payment of any and all of said securities. The Depositary shall, in such case, enforce and have the right to enforce, all the provisions of any of said securities and all and any other things that may be for the benefit and account of, or for the protection of the interests of the Company and the registered holders of said certificates.

"As any money comes into the hands of said Depositary by virtue of the power vested in it, as described in this paragraph, the Depositary shall pay said money to the registered holders of said mortgage certificates and to the Company as their interest respectively may appear . . . "

Other provisions (contained in article XIV of the Indenture) that have been considerably discussed in the briefs are as follows:

"The Company covenants and agrees to hold and save the Depositary free and harmless from all loss, cost, damage or expense occasioned by reason of the performance of any and all acts which may be performed by the Depositary in accordance with the terms of this agreement, so long as such acts are performed by said Depositary in good faith and with due diligence.

"The Company agrees that it will pay from time to time the reasonable compensation of the Depositary for all services rendered hereunder.

"The Depositary shall be under no obligation to pass upon the validity of the securities deposited with it or of the validity of any Policies of Insurance, Certificates, Guaranties or Abstracts of Title, part of or accompanying said securities, as to their binding force upon the companies or persons issuing them.

"The Depositary may conclusively rely upon the affidavit referred to in Article VII hereof as being filed by the Company with the securities deposited and will not be required to obtain any further evidence concerning such securities.

"The Depositary does agree, however, that it will promptly notify the registered holders of Mortgage Certificates issued in accordance with this agreement of its actions in case of

any default hereunder as defined in Article X and its reasons therefor.

"The Depositary shall not be responsible in any manner whatsoever for any recitals or any statements of fact herein contained, all of which are made solely by and on behalf of the Company; nor for the validity of this agreement; nor shall it be liable in any way for the consequences of any breach on the part of the Company of the covenants herein contained.

"Unless and until an event of default, as defined in Article X, shall have happened, the Depositary shall be under no obligation to collect the principal sums of said securities as they respectively mature, or to present any claims therefor against the estates of any deceased, bankrupt or insolvent debtors thereunder, or to collect any fire insurance that may be payable for the destruction by fire of any buildings or improvements on lands covered by said securities, or to do or to refrain from doing any other act or thing whatsoever in relation to said Certificates, Guaranties, Abstracts of Title and Securities, so deposited, unless and until it shall be requested so to do in writing by the Company a reasonable time before it shall be required to take such action requested by the Company."

It was agreed that:

"The Depositary, by the execution of these presents, accepts the duties and conditions herein set forth and imposed upon it, and agrees to hold the said securities in accordance with the terms hereof, and to perform its duties and offices as set forth herein in accordance herewith, and to regulate its acts and deeds accordingly."

While there were numerous other provisions in the Indenture we think the foregoing a sufficient recital of its contents for our present purposes. The said Indenture was executed in behalf of the Company by one William S. Porter as its president and one Winsor Soule as its secretary and by the Depositary by the same William S. Porter as its vice-president and one E. S. Porter as its assistant secretary.

According to the findings of the trial court, as soon as the corporation commissioner's permit, hereinbefore referred to, had issued, the Depositary began the exercise of its functions as contemplated by the above recited Indenture and continued to do so until June 4, 1932, when it gave to the Company a notice of default "and has ever since last men-

tioned date continued in the exercise as hereinafter set forth, of its functions and powers as 'Depositary' pretending to act under said Indenture and permit and none other''.

The court found that from the date of the organization of the Company, which occurred in 1922, until February 11, 1930, the said William S. Porter was its president, and one Fred D. Jackson its vice-president; that on that date Jackson succeeded Porter as president and continued as such until January 8, 1934; that Porter and Jackson owned all the common stock of the Company and together dominated and controlled its affairs from the time of its organization until February 11, 1930, after which and until January 8, 1934, Jackson dominated and controlled its business and affairs. According to this finding Porter, as a vice-president of the Depositary, was manager of its Santa Barbara office until he was transferred to Los Angeles late in 1928 or early in 1929, and up to the time of his transfer the business of the Company was conducted within the Santa Barbara office of the Depositary, and, indeed, Porter continued to be a director of the Company until 1932.

According to the findings a large number of certificates known as first mortgage certificates were from time to time issued by the Company, certified and authenticated by the Depositary and sold for cash then paid to the Company ''in the amount in each case equal to purchase price of each certificate, by the various purchasers who were in each certificate named and to whom they were in each instance sold and issued respectively''. A schedule of them numbered I headed ''Valid Certificate Holders'' is set out in the findings and it is found that subsequently and during the year 1933 all of the certificates included in that schedule were sold to the plaintiffs (respondents here) who now own them. Other certificates found to have been similarly issued for full value are contained in a second schedule numbered 1–A and headed ''Schedule of Other Valid Certificate Holders''. These latter certificates stand on the same basis as those described in the first schedule, except that they have not been assigned to the plaintiffs-respondents. It is found that as respects the certificates listed in the said schedule I the plaintiffs-respondents exercised their option in manner and form as provided in the Indenture to require the Company to purchase ''the part or shares of said securities represented by said various certificates for a sum equal to the respective designated pur-

chase prices of said various certificates . . . together with the registered owners' shares of all interest accrued on the securities from the sale of said respective certificates . . . '' It is found that, though duly notified of the exercise of this option the Company failed to repurchase any of said certificates and is in default for such failure, in consequence of which the Depositary, as above stated, served upon it on June 4, 1932, a notice of such default, as well as of its default, also found to exist, in the nonpayment of interest in accordance with the terms of the certificates and agreement. The finding is that the Company admitted the default and that, with its consent, the Depositary entered upon its duties as provided for by the Indenture in case of such default. In one of its further findings the trial court sets forth a further schedule entitled "Schedule II'', in which, with respect to each of the mortgage certificates still outstanding, there is noted its face value, which, except in the case of certain certificates issued to one Jane V. Reinert, hereinafter to be referred to, is the price for which it is found to have been sold by the Company, and there is also noted the date when it issued, the total amount of the certificates outstanding on that date, the figure which would represent 110 per cent of that amount and the aggregate par value of the securities on that date on deposit with the Depositary to secure the then outstanding issue of certificates. The effect of this appears to be to show that there were always securities on deposit sufficient in par value to meet the requirements of the Indenture that they amount to not less than 110 per cent of the amount of the outstanding certificates, had they in fact been all first mortgages or first trust deeds as the Indenture contemplated, but the actual fact as found and also shown on this schedule is that a large proportion of the securities deposited was made up not of first mortgages and first trust· deeds, as stipulated, but of second trust deeds or of the vendors' rights under executory contracts of sale of land, which latter were in at least a few instances subject to prior encumbrances. If all these were left out of account, the securities deposited would fall largely below the requirements. The trial court's finding is that, except for the said Reinert certificates, all the outstanding certificates were bought in good faith and for full value and that the purchasers were not aware of any deficiencies in the deposits of collateral required by the Indenture under which their cer-

tificates issued. It is found that "no collateral securities or assets was, or were at any time deposited with or held by said Depositary as security for said certificates, other than the collateral mentioned and shown in said schedule except such collateral as was deposited and withdrawn prior to June 4, 1932, without any record thereof being made or kept, but said collateral so deposited and withdrawn without any record thereof being made or kept did not at any time provide or constitute either by itself or combined with all other collateral on deposit, collateral either in amount or character, sufficient to secure the valid outstanding certificates as required by the terms of said Indenture and Permit".

Among the mortgage certificates listed as valid was one numbered 441 in the sum of $2,000 in the name of Jane V. Reinert. As to it no dispute arises, but the trial court found invalid certain others numbered 444 to 450, both inclusive, purporting to have been issued to her and now amounting in the aggregate face value to $52,150.00. As to this latter group of certificates, the trial court's findings 17 to 28, both inclusive, reveal a devious series of transactions, as to which that court's view can hardly be stated without quoting somewhat extensively from what is there said about them. These findings include, *inter alia*, the following:

"17. The Court finds the facts and conditions governing the issuance of the so-called Reinert Certificates Nos. 444 to 450, inclusive, purporting to be issued to Jane V. Reinert and embraced in said schedule, to be as follows: that on and for months prior to September, 1931, during which months the so-called Reinert Certificates Nos. 444 to 450, inclusive, (purporting to have been issued to Jane V. Reinert and embraced in said schedule) were issued, defendant Mortgage Securities, Inc. of Santa Barbara, referred to herein as the defendant 'Company' had incurred serious deficits in its operations and was in imminent danger of bankruptcy; that on and prior to September 25, 1931, said corporation was indebted to the County National Bank and Trust Company of Santa Barbara and the First National Trust and Savings Bank of Santa Barbara in sums amounting in the aggregate to approximately $80,000.00, unsecured, and also in various sums owed to individuals amounting in the aggregate to more than $10,000.00, all unsecured; that on or about said date, demand was made on said defendant 'Company'

by executive officers of said County National Bank and Trust Company of Santa Barbara and said First National Trust and Savings Bank of Santa Barbara for payment of said indebtedness due to said banks, respectively, and thereupon a conference occurred on or about September 25, 1931, in the City of Santa Barbara, California, between directors Wm. S. Porter, Fred D. Jackson, and others of the board of directors of defendant 'Company', at which meeting the indebtedness of defendant 'Company' to its various creditors herein referred to was discussed, but said 'Company' was unable to pay said indebtedness, or any part thereof, or to make any adjustment satisfactory to said banks, or either of them, at said conference, or at a meeting of the board of directors of said defendant 'Company' which occurred on the morning of September 28th, 1931, with directors Fred D. Jackson, Wm. S. Porter, and Winsor Soule and Donald W. Montgomery present at said meeting.

"The Court finds that after said conference of September 25, 1931, said Fred D. Jackson without notice to any of the other officers or directors of said defendant 'Company' caused one J. F. Ewing to execute an agreement between said defendant 'Company' and said J. F. Ewing purporting to be an executory contract to purchase from said 'Company' at the price of $54,465.80, nineteen parcels of real property of defendant 'Company', which nineteen parcels of real property were practically all of the unencumbered assets of defendant 'Company'.

"The Court finds that said morning meeting of the board of directors of defendant 'Company' of September 28, 1931, was recessed to the afternoon of that same day, at which afternoon meeting representatives of said two banks were to be present and it was anticipated said representatives of said banks would insist upon being made members of the board of directors of said defendant 'Company', in order that said banks might exercise control over said 'Company' and its affairs in the interests of said banks as creditors of said 'Company'.

"The Court further finds that said Fred D. Jackson on said 28th day of September, 1931, without notice to the other officers, or directors of defendant 'Company' and without notice to either of said banks, caused said Certificates Nos. 444 to 450, inclusive, known as the Jane V. Reinert certificates, to be issued and the entries in the ten accounts herein-

after mentioned in Finding 20 hereof to be made, all as hereinafter set forth and found and on said day in the interval between said morning and afternoon sessions of said board of directors of said defendant 'Company', caused said pretended agreement with J. F. Ewing to be filed and deposited with defendant 'Depositary' as collateral under said Indenture and thereupon caused defendant 'Depositary' to certify and authenticate and thereupon on said day defendant 'Depositary' did certify and authenticate, under its corporate seal in the form provided by said Indenture, First Mortgage Certificates in the aggregate sum of $68,500.00 purporting to be issued by defendant 'Company' to Jane V. Reinert, which said certificates included those designated as Nos. 444 to 450, inclusive, mentioned above and in said Schedule II.''

"18. The Court further finds that at and prior to the time of the execution of said pretended agreement of sale said J. F. Ewing was a personal employee of Fred D. Jackson and that nothing was paid down, nor expected to be paid at any time, upon the said contract; that said Jackson represented to said Ewing and it was understood and agreed between them, that said Ewing was signing and he did sign said contract merely as an accommodation and without expectation or intent of being called upon to make any payments thereon, and the Court finds that said contract and the whole thereof was fictitious and sham; that said property covered by said pretended contract included all the unencumbered real estate and substantially all of the unencumbered assets of defendant 'Company' and was carried by the defendant 'Company' on its books at its cost which was $51,501.50. No title certificate, or other evidence of title was procured or filed or deposited with said 'Depositary' as to the title of any of the real property covered by said pretended agreement filed and deposited, as aforesaid, with the defendant 'Depositary'. That an appraiser was procured by said Fred D. Jackson, named W. C. Paulton, to make and furnish and who did make and furnish a pretended appraisement in writing of said nineteen parcels of real property covered by said agreement, representing said nineteen parcels of real property to be of the value of and purporting to appraise said property at $115,000.00, and said Fred D. Jackson caused the same to be deposited with said 'Depositary' at or about the time of the pretended issuance of said

certificates. That said Paulton was not a disinterested appraiser; that he was at that time indebted to defendant 'Company' to the extent of several thousand dollars; that said certificates were certified and authenticated in the form provided by said Indenture in the office of 'Depositary' in the City of Santa Barbara, California, by an assistant secretary of defendant 'Depositary' at the request of said Fred D. Jackson, while the Santa Barbara executive manager of said defendant 'Depositary' was absent from the said office of 'Depositary'; and that at and prior to the time of the pretended certification and authentication of said alleged certificates, as aforesaid, said Santa Barbara executive manager of defendant 'Depositary' had been and was ordered by the executive officers of defendant 'Depositary' in charge of the principal office of defendant 'Depositary' in the City of Los Angeles, California, and who had control and supervision of said Santa Barbara office, not to certify or authenticate any more or additional First Mortgage Certificates issued or sold by defendant 'Company' because and on account of the unstable financial condition of defendant 'Company'; that the executive manager of defendant 'Depositary' in charge of its Santa Barbara office was not informed and did not learn of the issuance, certification and authentication of said certificates, or any of them, or of the deposit of said fictitious and sham agreement of sale to secure payment thereof until some weeks thereafter and William S. Porter, who was at that time executive vice-president of defendant 'Depositary' and who had his headquarters in the Los Angeles office of defendant 'Depositary' in Los Angeles, California, and who was also at the time a director of defendant 'Company' first learned, or was informed of the issuance and authentication of said certificates by defendant 'Depositary' and the deposit with said 'Depositary' of said fictitious and sham agreement of sale about three weeks after September 28, 1931, but, upon the discovery by said Santa Barbara executive manager and said Los Angeles executive officers of defendant 'Depositary' of the issuance and authentication of said certificates and of the nature of the pretended collateral deposited to secure payment thereof, to-wit: said fictitious and sham agreement of sale, no demand was made by 'Depositary' upon any person, or persons, for, and nothing was done, and no steps of any kind were taken by said executive officers or by defendant 'De-

positary' to procure the cancellation of said certificates, or any of them, or of its authentication on the same, or on any of them, at any time, and no notice of the issuance or authentication of said certificates, or of the deposit of said fictitious and sham agreement of sale, was given to any of the holders and owners of any of the other outstanding First Mortgage Certificates issued by defendant 'Company' and authenticated by defendant 'Depositary', and nothing was done in reference to said pretended collateral, to-wit: said fictitious and sham agreement of sale, except that said 'Depositary' did, on or about May 4, 1932, procure the execution and deposit with it of the promissory notes and trust deeds to secure same, hereinafter mentioned in Finding 31 hereof.

"19. The Court further finds that no statement or reference was made in the minutes of the defendant 'Company' to the Jane V. Reinert transaction in any of its aspects, nor was the said transaction or Jane V. Reinert herself referred to either in the conference of the directors or the defendant 'Company' on or about September 25, 1931, or in the meeting of the board of directors held in the morning of September 28, 1931, nor at the meeting following the recess, in the afternoon of September 28, 1931, and that although the deposit of said Ewing contract and the issuance of said Reinert certificates had been accomplished immediately prior to the afternoon meeting of the board, the said representatives of said banks present at the afternoon meeting were not advised of the transaction nor did they learn of the same until late in the year 1931 in the month of December when, upon their suspicion being aroused, an audit of the books and records of defendant 'Company' by independent auditors was made at their instance. Said audit was begun on or about December, 1931, and was completed on or about January ——, 1932. The circumstances and facts as to the issuance of Certificates Nos. 444 to 450, inclusive, known as the Jane V. Reinert certificates, in so far as the deposit of the Ewing contract and the entries made closing the ten accounts referred to in the next succeeding finding, and the contemporaneous issuance of the said Jane V. Reinert certificates, together with the transfer to said Jane V. Reinert of certain trust deeds, were set forth in the report made by said auditors and the said representatives of defendant County National Bank and Trust Company of Santa Barbara, and of the First National Trust and Savings Bank of Santa.

Barbara, read said audit either in the month of December, 1931, or in the month of January, 1932. Neither the contents, nor the result of this audit, or the report thereof, made by said auditors were furnished to the certificate holders, nor were they or any of them informed of the pretended issuance and authentication of said Reinert certificates, or of any of them, or of any of the facts and circumstances connected with the issuance of said Reinert certificates, or any of them.

"20. The Court further finds that upon the 28th day of September, 1931, and immediately preceding the issuance of said Reinert Certificates Nos. 444 to 450, inclusive, there were upon the books of the defendant 'Company' a series of uncertain and questionable accounts, 10 in number, each with a separate account number, seven of which were in the name of Associated Almond Growers of Paso Robles. Some of these accounts purported to be debit accounts and some purported to be credit accounts. These ten accounts included two accounts carried on the books of defendant 'Company' at the direction of Fred D. Jackson in fictitious names, and one account in the name of Jackson's wife, Alice P. Jackson; that Fred D. Jackson had an interest in some of these accounts and that upon the said 28th day of September, 1931, and in anticipation of the action of the bankers hereinabove referred to, the said Jackson, who was president both of defendant 'Company' and defendant Associated Almond Growers Company of Paso Robles, did order and procure a journal entry to be made upon the books of the defendant 'Company' purporting to transfer the entire net credit balance amounting to $125,000 purporting to exist against the Mortgage Securities Company as a result of said 10 accounts, to said Jane V. Reinert, and did thereupon enter to her credit the amount of $53,000.00 in accounts receivable, that is, trust deeds and mortgages belonging to the defendant 'Company', and $68,500.00 in mortgage certificates including said Certificates Nos. 444 to 450, and thus did at that time obliterate and close said accounts, as they stood before the said journal entry of September 28, 1931.

"21. The Court finds that up to the said 28th day of September, 1931, and prior to said journal entry there had been no transactions between the defendant 'Company' and said Jane V. Reinert entered or shown in any of the books, records or papers of said defendant 'Company', except in one

instance as hereinafter noted in this finding, that the said Jane V. Reinert and her husband, Nels P. Reinert, were old personal friends, and business associates of the said Jackson from a period running back at least as early as 1918, and that the said Nels P. Reinert and the said Fred D. Jackson were at the time of the trial, and had been continuously for seven years or more, vice-president and president, respectively, of the Associated Almond Growers of Paso Robles.

"The Court further finds that said Jane V. Reinert did not at any time ever purchase any mortgages or deeds of trust of the defendant 'Company'. The Court finds that at no time did the said Jane V. Reinert ever purchase or pay for any mortgage certificates, except one certain mortgage certificate No. 441 of the par value of $2,000.00, which was issued and sold for cash paid to it at the time, by or on behalf of Jane V. Reinert on said 25th day of September, 1931.

"22. The Court further finds that the said Jane V. Reinert executed a general power of attorney to Duncan P. Jackson, son of Fred D. Jackson and associated with Fred D. Jackson in the office of the defendant 'Company', on the 20th day of September, 1931, in the County of Santa Barbara; but no conference occurred and no understanding or agreement was had or made between the said Jane V. Reinert and the said Fred D. Jackson, or the defendant 'Company', or said Duncan P. Jackson on that occasion, or upon any other occasion regarding any financial relationship, or any financial transactions, personal, or otherwise, between the said Jane V. Reinert and the said defendant 'Company'. No Demand upon defendant 'Company' was ever made by or on behalf of Jane V. Reinert for money, evidence of investment, or of any financial transaction between herself and the said defendant 'Company' either before September 28, 1931, on that date, or at any time thereafter, nor was any statement, report, or accounting ever furnished or made to her before September 28, 1931, or on said date, or thereafter up to the beginning of this action.

"The Court further finds that no interest was ever actually paid to Jane V. Reinert, or to any one else, purporting to have accrued, or which did accrue, upon said ten accounts, or any of them, referred to in Finding 20, nor did said Jane V. Reinert actually pay at any time to the defendant 'Company' any sum or sums, except for Certificate No. 441, the sum of $2,000.00, or make any deposit whatsoever with

the defendant 'Company', nor did she ever loan any money to the defendant 'Company'.

"23. The Court finds that the so-called Reinert Certificates Nos. 444 to 450 turned up in the spring of 1933 when they were used by Fred D. Jackson as collateral for a loan to said Jackson which had been made by the County National Bank and Trust Company of Santa Barbara to him in 1930, and there they remain.

"24. The Court finds that Certificates Nos. 444 to 450, inclusive, purporting to have been issued to Jane V. Reinert were not, nor was any one of them issued for cash or for other consideration, but each and all of them were issued for a pretended cancellation of certain purported mutual open and current book accounts, mentioned above, which prior to the journal entry of September 28, 1931, referred to in these findings, appeared to exist upon the books of the defendant 'Company' between the defendant 'Company' and the Associated Almond Growers of Paso Robles, N. F. Thompson, Thomas B. Jones, and Alice P. Jackson, both N. F. Thompson and Thomas B. Jones being fictitious names; and the Court finds that the credits purporting to exist or shown upon said 10 accounts against the said defendant 'Company', were shown by the books of defendant 'Company' as resulting from purported transactions extending over a period from the year 1927 to the early part of 1931, inclusive.

"25. The Court further finds that said certificates so issued to Jane V. Reinert, as stated in the preceding finding, were, and each of them was issued at a time when there was insufficient collateral on deposit with the defendant 'Depositary' to permit the issuance of any of said certificates, to-wit: Nos. 444 to 450, inclusive, in accordance with and as required by the terms of the Indenture and Permit, nor has there at any time been sufficient collateral on deposit to permit the issuance of the said certificates, or of any of them.

"26. The Court finds that the said Ewing contract was deposited and said certificates last mentioned were issued while defendant 'Company' was insolvent and known by Fred D. Jackson to be insolvent and at the instance of said Fred D. Jackson and that the issuance of said purported certificates was procured by said Fred D. Jackson and was done in the full knowledge of Fred D. Jackson as agent of the said Jane V. Reinert, of all the facts herein set forth bearing upon the infirmity and invalidity of said certificates

and with the full knowledge that said certificates were issued without payment of cash or other consideration and without the support of collateral required by the Permit and said Indenture.

"27. (The Court finds that the action of Fred D. Jackson in procuring the pretended execution of the so-called Ewing contract and its deposit as collateral with the defendant 'Depositary', was done and made to the prejudice and damage of the creditors of the defendant 'Company', its stockholders and the holders and owners of said valid certificates.)

"28. The Court finds that the said Jane V. Reinert had no right or title or interest or property in or to said Certificates Nos. 444 to 450, inclusive, or in any of them."

The trial court went on to find that between the late fall of 1931 and the spring of 1932 the executive officers of the Depositary, having discovered that these Reinert certificates had been issued and authenticated and the fictitious Ewing contract deposited as collateral for the same, instituted an investigation of the condition generally of the collateral in the Depositary's hands as security for the Company's outstanding certificates and discovered that instead of having exclusively first mortgages and first deeds of trust as required by the Indenture and corporation commissioner's permit there were really on hand numerous executory contracts of sale and "insufficient collateral of the character required" by said contract and permit, upon which the outstanding certificates could have issued. Thereupon it is found that, though the Company was not indebted to the Depositary it was required by the latter, on or about May 4, 1932, to execute to the Depositary and did execute to it, its own promissory notes for $51,015.32 payable on or before three years after that date with interest, and to execute, to secure the same, a deed of trust covering the identical property involved in the purported Ewing contract, all as further collateral security for the mortgage certificates; and that the Depositary also required the Company for the same purpose, to execute sixteen further promissory notes in favor of it—the Depositary—aggregating $33,412.17 and to execute deeds of trust to secure them affecting the properties covered by sundry of the executory contracts of sale theretofore delivered to the Depositary as collateral for the certificates. It may be gathered from the findings that the Depositary proceeded to fore-

close these latter sixteen trust deeds; for it is found that it took title to all of the property described therein and has since collected the rents, issues and profits thereof and claims to hold the title to the land as security for the outstanding mortgage certificates.

It is found that, though the Depositary became aware of all the facts concerning the Reinert and Ewing transactions prior to May 4, 1932, it failed to notify the holders of the valid certificates of any of them but instead issued, both on June 4, 1932, and on October 13, 1932, communications to the certificate holders representing that it held policies of title insurance with each item of collateral deposited with it, showing the same to be secured by first mortgages or first trust deeds, though such was not the fact. It is found that the Depositary knowingly permitted the Company to issue to various of the plaintiffs-respondents' assignors mortgage certificates after it had knowledge that the same were not secured by the collateral required by the Indenture or by the state corporation commissioner's permit, and that all this was done in order to induce the purchasers to buy the mortgage certificates. It is found that the Depositary never made any accounting of the collateral in its hands to the certificate holders except as it did so in court after the present action was instituted. The findings proceed to detail all of the property, real and personal, derived from the Company and now in the hands of the Depositary, all of which is found to be subject to a lien for the benefit of valid certificate holders as of date September 21, 1936. This consists of $32,-270.44 in cash, a considerable number of trust deeds, certain other items of personal property, and numerous parcels of real estate found to be derived from foreclosure by the Depositary. There are various other particulars in which the Depositary is found by the trial court to have been guilty of irregularities and to have fallen short of performing its duties. It is found to have failed to keep records of securities deposited and withdrawn, to have failed to secure the deposit of sundry schedules, appraisals and affidavits, and, when it surrendered collateral deposited with it, to have failed to keep any record of the schedules, appraisals or affidavits that it did get when it originally received the securities so surrendered. It is found to have allowed sundry notes and deeds of trust purporting to be deposited with it as collateral to remain in the actual custody of the Company.

It is found, in foreclosing securities in its hands, in certain instances not to have required cash from the purchaser but to have permitted him to execute trust deeds for the purchase money to the Company and then to have taken assignments of these from the Company. It is found to have brought about the termination of the rights of purchasers under executory contracts of sale, irregularly deposited with it as collateral, and then, instead of itself realizing cash for the lands, to have instigated the making by the Company of new contracts of sale for the same land to new purchasers and irregularly and outside of any authority from the corporation commissioner, to have accepted as collateral a redeposit of these new executory sales contracts. It is found without authority to have applied to its own use, of funds received by it as Depositary, an aggregate of $2,375, and, likewise without authority, to have paid from such funds to its attorneys the sum of $450.

There are many other matters embraced in the findings but we do not find it necessary to detail them.

The trial court concluded *inter alia,* as matters of law, that under its agreement with the Company and the permit issued to the Company by the corporation commissioner upon the issuance and sale of the Company's mortgage certificates and the Depositary's authentication of them the latter ''became a trustee of and for the holders of valid certificates''; that the effect of the Depositary's action was to represent, guarantee and warrant to the *bona fide* purchasers of such certificates that it held collateral for the same in accordance with the terms of the above recited Indenture; and that, in that it did not hold the same, it violated its terms and thereby became chargeable, together with the Company, with the total purchase price paid by the *bona fide* purchasers of the certificates found to be valid, with interest thereon at seven per cent per annum from December 1, 1931; that such holders of valid mortgage certificates are entitled to a first lien on the assets deposited with the Depositary to satisfy so far as may be the sums due them; that said Depositary is under obligation to liquidate the assets in its hands under the court's supervision and make *pro rata* payments to the said purchasers from the proceeds of the liquidation; that, as against the Company, the Depositary is entitled to compensation for its services to the extent of $10,000 and to a lien for that sum, with interest, on the assets in its hands junior and

subordinate to the lien of the mortgage certificate holders for the amounts due them, and to a judgment against the Company for any deficiency in said compensation that may result from the liquidation of the assets and the application of the proceeds as ordered by the court; and also to have included in its judgment against the Company a further amount equal to such sums as such Depositary may be itself required to advance to satisfy any deficiency in the proceeds to be derived from liquidating the said assets in the amounts due the valid certificate holders, with interest thereon; that except for the said certificate 441 for $2,000 Jane V. Reinert is not the owner or holder of any valid mortgage certificate or certificates of the Company and that such certificates 444 to 450, both inclusive, are void; that the Depositary is also entitled to such additional compensation for carrying through the liquidation as may be hereafter allowed by the court; that the Company is entitled to any proceeds of the liquidation of the assets, if such there be, after satisfaction of the sums due to the valid certificate holders and the Depositary respectively; that in addition to the cash sums in its hands from deposited assets, the Depositary is chargeable with the $2,825 applied to its own uses and paid to its attorneys between June 4, 1932, and September 21, 1936; that all cash in the Depositary's hands from deposited assets, including said $2,825, should be ordered immediately paid by it to the valid certificate holders in the respective amounts set out.

The judgment entered pursuant to these findings provided in detail for putting the court's determination into effect; calling for a further accounting by the Depositary within thirty days thereafter to bring its statements of assets held by it up to date, directing it to proceed with the liquidation, foreclose upon delinquent securities, and make sales of assets subject to supervision by the court, for completing which liquidation it was allowed a period of four years, during which time the holders of valid certificates were to be entitled to interest on balances from time to time unpaid of the amounts due them. The Depositary is required at intervals to account to the court for its proceedings taken to carry out the liquidation and the court reserves the right to terminate the period allowed for liquidation at any time for failure to properly and diligently conduct the same. At the end of the liquidation or its earlier termination by the court the Company and the Depositary are made unconditionally

liable for any sums remaining unpaid upon the indebtedness to the holders of valid certificates and judgment is to be entered thereon for any such deficiencies accordingly upon which execution is to issue on the order of the court.

### The Reinert Appeal.

Mrs. Reinert attacks the judgment on various grounds, asserting that the findings of fact are not supported by the evidence; that the conclusions of law are not supported by the findings of fact; that the judgment is against law; that she is entitled to relief in equity and that the judgment should be reversed with instructions to the trial court to enter judgment in her favor.

With respect to the consideration claimed to have been given by Mrs. Reinert for the issuance of the certificates other than that numbered 441 to her, she relies on the testimony of the said Fred D. Jackson and that of one George Giovanola, one of the firm of Giovanola & West, auditors, appointed by the trial court, given with relation to his audit, as well as upon her own testimony given in the form of a deposition. The books of the Company and the audit made by the Giovanola & West firm show, to use the language of counsel for this appellant "ten accounts carried under the contract section of the system of bookkeeping employed by the Company. These ten accounts consisted of seven accounts carried in the name of Associated Almond Growers of Paso Robles, one account carried in the name of Thomas Jones, one account carried in the name of N. F. Thompson, and one account carried in the name of Alice P. Jackson." The Company books, insofar as entries made prior to September 28, 1931, are concerned, do not, otherwise than such light as the use of those names may be thought to shed on the matter, show the sources of the bulk of the money deposits carried in these ten accounts, through which, during the several years in which, up to that time, they were carried, there appears to have passed an aggregate of no less than $536,-395.03, though no such amount was ever in the ten accounts taken together, on deposit with the Company at any one time.

Some items, indeed, are of clearly ascertainable origin, as, for example, that during the time the accounts were kept there was credited to them a net aggregate of $19,515.46 as interest, in addition to which it is made to appear that in the Alice P. Jackson account there was included a credit of

$8,010.00, of which $3,500 was salary accrued to Fred D. Jackson as an officer of the Company, $3,960 from the sale of 36 shares of stock apparently belonging either to Fred D. Jackson or to Alice P. Jackson, and $550 on account of certain funds collected for A. P. Jackson. With relatively minor exceptions, however, the source of the large sums that were deposited in the Company's bank account and credited to these ten accounts cannot be ascertained from anything entered on the Company's books prior to September 28, 1931. According to the books the net credit balance in favor of the several customers in whose names these accounts were carried was, as of September 28, 1931, $133,770.50. The claim made by appellant, Jane V. Reinert, before the trial court and on this appeal is that, except for the item of salary of Fred D. Jackson, just referred to, and the other two items above specified from the Alice P. Jackson account, and an interest that Fred D. Jackson claims to have had in the account carried in the name of Jones, which excepted items will be hereinafter discussed, all of the credits carried in these ten accounts are derived from initial deposits of her own moneys made by her or in her behalf with the Company, increased by the Company's operations in handling these funds for her.

The system of bookkeeping employed by the Company is thus described in the opening brief of Mrs. Reinert's counsel:

"The Company maintained in its bookkeeping system a master contract receivable account. This account carried the total balance due to the Company on outstanding deeds of trust, mortgages, and contracts. In other words the balance appearing in the master contract receivable account represented the total amount of deeds of trust, mortgages and contracts owned by the Company. As credit balances appeared on the accounts under which the Reinert funds were kept, the control contracts receivable account of the Company was decreased by the amount of such credit balances, and the account under which the Reinert balances were carried reflected that contracts in the amount of such credit balance had been allocated generally to the ten accounts. Thus the bookkeeping system of the Company always reflected that the funds on deposit with the Company under the said ten accounts above mentioned had been applied to the purchase of trust deeds, mortgages, etc. Specific mortgages and deeds of trust were not allocated at any time to

Jane V. Reinert, by reason of the fact that the accounts varied in credit balances from time to time, and it was impracticable to allot specific deeds of trust and mortgages to the balance appearing on the said accounts. The total amount of deeds of trust and mortgages allotted to these accounts always appeared, however, on the control contracts receivable account in the bookkeeping system of the Company. These ten accounts, or the credit balances thereof, were never carried on the books of the Company as accounts payable but as hereinabove set forth, always appeared and were reflected as purchases of deeds of trust and mortgages. As a result of the various deposits and accruals to these ten accounts, the accounts reflected at all times a large credit balance, to which credit balance a similar sum in deeds of trust and mortgages was always allocated on the control contracts receivable account in the books of the Company.''

It is, in the opening brief for Mrs. Reinert, conceded that the ''records were kept under the direction and control of Fred D. Jackson'' and that ''the Jones and Thompson accounts were carried under fictitious names, both Jones and Thompson being nonexistent persons.'' Alice P. Jackson is the wife of Fred D. Jackson. According to counsel for Mrs. Reinert:

''The various accounts were carried in this manner for the purpose of identification and classification by reason of the fact that the receipts and disbursements through the various accounts were from various places and for various purposes, and it was, therefore, desirable that the accounts be kept segregated in the manner set forth.''

It is in one of the audits made under the court's direction by said firm of Giovanola & West and placed in evidence, stated that:

''The net total credit balance of these ten accounts amounting to $133,770.50, was further reduced on September 28, 1931, by drawing a check payable to the 'Associated Almond Growers of Paso Robles' for the amount of $8,770.50 and charging the account of 'Thomas B. Jones, Acct. #1260'. This entry reduced the credit balance of the 'Jones' account from $28,145.30 to $19,374.40, and it likewise reduced the net total credit balance of the aggregate ten accounts from $133,770.50 to $125,000.00. This disposal of this net credit balance of $125,000.00 as evidenced by Journal Entry of September 28, 1931, is as follows: Contracts Receivable Seconds were charged

with $125,000.00 and crediting: Suspense $3,500.00; Customers' Loans Jane V. Reinert a-c #1353, $53,000.00; First Mortgage Certificates, Jane V. Reinert Certificates Nos. 443 to 451, inclusive (9 certificates), totaling $68,500.00.''

The record shows that, subsequent to the said transactions of September 28, 1931, but immediately thereafter, the Company paid off mortgage certificates 440 and 451, issued as just set out in Mrs. Reinert's name, and partially paid certificate 450 and that the net aggregate of the remaining principals of the certificates 444 to 450, both inclusive, issued in her name and involved in the present litigation, is, as already stated, $52,150.

With respect to Mrs. Reinert's connection with these occurrences Fred D. Jackson testified at length. His account of the matter in brief is as follows: He had been acquainted with Mrs. Reinert and her husband, Nels A. Reinert, having known them in Chicago as far back as 1916 when he practiced law there and they were his clients. In 1926 or 1927 he suggested their making deposits for Mrs. Reinert's account with the Company and they agreed to do so. He had many subsequent conversations with them on the subject, though Mrs. Reinert left the details largely to her husband. The first talk when they were both present was in Paso Robles. Later they have come to reside in Atascadero. Jackson was then and still is president of the Associated Almond Growers, a concern operating in that region, and Mr. Reinert then was and continues to be its vice-president. Reinert had gone into this concern about 1920 at Jackson's suggestion. Jackson testified that with Reinert's assistance he controlled this corporation in its activities from about 1924 on. Jackson's proposition to Mrs. Reinert was that she deposit money with the Company, which would in its turn loan parts of it to the Almond Growers, and any balance not so loaned and not needed by the Almond Growers would be invested for her in either first mortgages or first mortgage certificates. Pursuant to this arrangement which was verbal, Jackson says that:

''Mrs. Reinert advanced to the Associated Almond Growers through the medium of these accounts and allowed the Mortgage Company to take any excess and invest it for her in first mortgages and first mortgage certificates. *The mortgages* were not actually allocated to her or certificates actually issued to her, because if we did that we would have

to change the certificates every day. It was left in this condition until it was thought advisable to close it.''

In this connection he testified further with respect to the Jones account as follows:

''Those accounts are put in the contracts receivable. It was shown as a purchase of contract, not as money due or a liability of the Mortgage Company at all.

''Q. What contracts were shown as being held by that account?

''A. No specific contracts were allocated to it.

''Q. What contracts were allocated to it?

''A. Anything that might be turned over in the final analysis.

''Q. No contracts were allocated to them or set aside for them at that time?

''A. No, sir.''

The claim is that the other nine of these accounts were all handled in the same way. Asked whether he merely had in mind that at some time he might turn over certain contracts, he said:

''We did turn over certain contracts if the money was not paid back. It was the same way as we had done in the other cases that we had. Of course not to this extent, but if people wanted to come in and buy securities they could deposit money and when they had deposited sufficient money they got their securities.''

No securities, according to him, had been definitely allocated for any of the accounts ''except as it reduced the securities held by the Mortgage Company by the ten accounts'', by which he means that the aggregate of the sums receivable by the Company on contracts held by it was treated as so reduced.

As respects the loans claimed to have been made by the Company from Mrs. Reinert's deposits to the Associated Almond Growers, Jackson testified that interest was charged the Almond Growers at the rate of twelve per cent per annum, whereas Mrs. Reinert was credited with seven per cent interest on the money in the Company's hands, the difference of five per cent being retained by the Company as its profit. Collections from the Almond Growers on Mrs. Reinert's account were, according to Jackson's testimony, not paid to her but simply credited to her on the books.

Referring to the transactions of September, 1931, Jackson testified that the Reinert situation was discussed at two meetings of the directors, held respectively on September 25th and September 28th, the first of which was informal in character and not reported in the minutes; that Mrs. Reinert's connection with the deposits carried in the ten accounts under discussion was well known to the members of the board; that the Company was under pressure from two of the Santa Barbara banks to pay up loans which they had made to it amounting to about $80,000 which it was not at the time able to repay, having then on hand only something like $28,000 in cash; that he, Jackson, expressed a desire to see Mrs. Reinert's investment protected, in which the other directors concurred; that at the meeting of September 28th there were present, besides himself, directors Porter, Soule and Montgomery. The minutes show that this meeting convened in the morning and continued until noon when it was adjourned until 3 P. M. and makes no mention of Mrs. Reinert, though they do say that "the president made a lengthy statement giving the affairs of the company in full detail and the situation with reference to the loans and the moneys borrowed from the bank." Jackson testified that the Reinert situation was, on this occasion, discussed, and that:

"At the meeting on the twenty-eighth we talked about the previous things discussed on the twenty-fifth and carried out the matters which were discussed on the twenty-fifth."

Asked what these were he said:

"That the Company would segregate to Mrs. Reinert a number of first mortgages and in the event there were not enough first mortgages which we had deposited for that purpose we would then segregate and turn over to her second mortgages for the difference; that a contract would be entered into with Ewing, who was a clerk in my office, not the Mortgage Company office, but who was working for me, that the contract would be deposited with the Security Title Insurance and Guarantee Company and certificates would be issued against that and would be turned over to Mrs. Reinert. On the morning of the twenty-eighth these certificates were prepared, signed and authenticated by the Trust Company. The contract with Ewing had been prepared by me after the meeting of the twenty-fifth and before the meeting of the twenty-eighth and I think had already been signed and was deposited with the Title Company."

The certificates were to be turned over to Mr. Ewing "for the balance due on these ten contracts". There seems to be no dispute that all this was done prior to the reconvening of the directors' meeting at 3 P. M. at which time Montgomery, one of the directors, resigned and two representatives of the creditor banks were at the demand of the banks elected to the board. The minutes of the meeting as so reconvened at 3 P. M. of September 28th contain no mention of the Ewing contract nor of any settlement with Mrs. Reinert, nor is it claimed that anything was then said to the two new directors about any of these matters.

Mrs. Reinert was not present at the trial but her deposition taken at Santa Barbara was read in evidence. She testified that she did not personally talk with Jackson about any investment in the Company about the year 1927 but that, together with her husband, she did subsequently have conversations at various places with him on the subject. No one else was present. Asked for details she said:

"I am afraid I couldn't go into it very much because my husband handled those things and I just listened and I couldn't tell just exactly what was said because it has just been at different times."

According to her testimony she does remember that shortly after she and her husband came to California (which she says was in 1927) there was some talk about an investment in "mortgages and certificates". She says it was her money, not her husband's, that was involved. Her husband explained it but she doesn't know much about it. "I trusted him and let him look after things." She thinks that she probably saw some mortgage certificates but "don't know if I just remember them exactly." She does not know when she saw them. She has access to her safety box at Paso Robles but doesn't go through it. She is not very inquisitive. She has seen these mortgages or certificates in her box but never examined them. She doesn't know whether she ever had any conversation with Jackson in the year 1931 about the state of her account with the company. She cannot say whether anything gave her any concern that year about her account. The certificates are not in her box now because she gave her husband permission to put them up for some money at the County Bank at Santa Barbara. He explained the transaction but she has forgotten the amount. She never saw a copy of her account with the Company but left that up to her

husband. She doesn't know how much she had invested in the mortgage securities but it was $55,000 or $60,000. No explanation was ever made to her that she was loaning money to the Associated Almond Growers through the Company. Her money went into certificates. She has been married eighteen years. When she was married her husband was in the hotel business in Chicago and had been for several years. Before that she says that she had been employed as secretary in an insurance office in Denver on a commission and salary and really had charge of the office and earned from $125 to $150 a month. Her husband had previous to their marriage been engaged in the brokerage business, selling stocks and bonds in Chicago. She had accumulated $2,000 or $3,000 of her own. Just before they came to California sale had been made for $200,000 of a hotel in which her husband had a half interest and "that was mine so I had close on to $100,-000. . . . I put my money into it and that was mine. He gave it to me." He had an interest in three hotels. She doesn't know whether her husband ever invested any of her money in the Associated Almond Growers, but does know that what came out of the hotel sale was not so invested. Her husband "has always taken care of those things for me". She thinks he may have her power of attorney. Her money was deposited in the Drexel State Bank at Chicago. She may or may not have drawn a check transferring it to California. She doesn't remember. She may have drawn checks for investment in bonds and other securities while her account was still in Chicago but she doesn't remember. She has burned up such records as she had of those things. She must have made some transfer of securities to invest funds in the Company but her husband attended to all that for her. She just remembers in a vague way that it was done. She doesn't remember that $50,000 or $60,000 was put in at any one transaction. As far as she knows $10,000 may have been put in at one time and $10,000 at another. She does know that Duncan P. Jackson holds her power of attorney. Her husband presented this power of attorney for her to sign. She does not know when it was signed or what has been done under it. She only knows that her husband told her it was to enable him to look after the certificates at Santa Barbara. She guesses that this power of attorney is still outstanding. She doesn't think she has any cancelled checks showing the

investment of her funds in the Company. After a few years she got rid of her cancelled checks.

There is a good deal more testimony of like character in Mrs. Reinert's deposition but what we have thus summarized is typical of it all. She does not claim to have known anything specifically about what occurred in September, 1931.

Her husband, Nels A. Reinert, who ought, according to the evidence, to know intimately the details regarding her investments was not produced in her behalf or at all as a witness, nor does his absence appear to be accounted for.

William S. Porter, who as we saw, was an officer of the Depositary and a former president of the Mortgage Company and continued to be one of its directors, attended the meeting held on September 28, 1931, He testified at length at the trial. He knows nothing about the alleged informal directors' meeting of September 25, 1931, for when asked whether there had been any conversation between him and Mr. Jackson or any of the other directors mentioned in the record of the meeting of September 28th his answer was:

"No, not that I remember of except that I think I was asked to come because there were important matters that they wanted to discuss."

Asked about what actually transpired at the meeting of September 28, 1931, his recollection is that the discussion centered about the moneys due to the bank and the impossibility of raising the funds necessary to satisfy them. His testimony includes the following:

"Q. Was any reference made to a lady by the name of Jane V. Reinert?

"A. No, not that I know of.

"Q. No reference was made at that meeting to Jane V. Reinert?

"A. Not that I remember of.

"Q. Was any reference made at that meeting to the husband of Mrs. Jane V. Reinert?

"A. No, not that I remember of.

"Q. Did you have any discussion with Mr. Jackson at any time before the meeting either on the day of the meeting or any day preceding the meeting about an indebtedness of the Mortgage Securities to Jane V. Reinert?

"A. I wouldn't try to fix the date, but on occasions preceding this Mr. Jackson had told me that, from time to time— I thought he said the Associated Almond Growers, he may

have said Reinert—had deposited funds with the Mortgage Securities which I understood were funds deposited at certain seasons when they were not necessary to the conduct of the Almond Growers' business, and that he was able to get them to make these deposits with the Mortgage Company for the use of the Mortgage Company during those periods.

"Q. What use did he tell you the Mortgage Company was making of these deposits?

"A. I wouldn't try to quote him, but I got the impression from what he told me that the funds would be used as an advance to the Mortgage Company in any way he chose to use them. He was at that time in charge of the Company's affairs."

He further testified as follows:

"Q. I will ask you if you have any recollection whether Mr. Jackson explained whether this money was being loaned to the Mortgage Securities by the Almond Growers Association or merely placed on deposit to be loaned for the account of the Almond Growers Association?

"A. My recollection is that the money was paid in to the Company and treated as an advance by the people, whether it was the Associated Almond Growers or the Reinerts, and Mr. Jackson was to determine how it was to be used.

"Q. Had you ever heard of Jane V. Reinert before you left here in 1928?

"A. Yes. . . . I learned it shortly after Mr. Jackson had taken charge of the company. I won't try to fix it by years."

Asked again whether at the directors' meeting of September 28, 1931, any reference was made to Jane V. Reinert or with reference to the issue of certificates to her, he proceeded:

"A. I don't recall any reference being made.

"Q. When did you first learn that certificates had been issued to Jane V. Reinert, and the certificates I am referring to are the certificates issued on or about September 28, 1931.

"A. Some weeks after they had been authenticated."

. . . . . . . . . . . . . .

"Q. How many weeks after the meeting at Santa Barbara did you learn that fact?

"A. I learned it, I would say, between one or three weeks after the certificates were authenticated at the office.

"Q. At this directors' meeting on September 28th, 1931, in Santa Barbara was there any discussion of any indebted-

ness owing at that time and unpaid to the Associated Almond Growers of Paso Robles by the Mortgage Securities?

"A. I can't say. Undoubtedly we went over the entire ledger cards, and if those were there, then of course we seen them.

"Q. Did Mr. Jackson make any explanation as to why or how those ten accounts appeared in that group?

"A. No sir."

Referring to a visit made by him as an officer of the Depositary to Santa Barbara at some time subsequent to September 28, 1931, he testified:

"A. . . . I had previously some weeks prior to September 28, had given definite instructions to Mr. Barnard, then in charge of the Security office, under no circumstances should any more certificates be authenticated by the title company without referring them to the head office, and upon my return to Santa Barbara, I asked if that order had been followed out and Mr. Barnard told me it had, and upon further pressing him, he said, 'I will get the book and show you'. And upon getting the books I found that they had been authenticated, and Mr. Barnard explained that they had been authenticated without his knowledge, and by the assistant secretary.

"By the Court: Without whose knowledge?

"A. Mr. Barnard's knowledge.

"By Mr. Rogers: What was that last?

"A. Mr. Barnard explained that they had been issued without his knowledge and by the assistant secretary, Miss McGaw, during the noon hour.

"Q. While Mr. Barnard was absent?

"A. During the noon hour, or at least, I understood during his absence."

He learned of the deposit of the Ewing contract at the same time that he learned of the authentication of the Reinert certificates.

Porter testified that he never personally participated in any transactions either with the Almond Growers or with Mrs. Reinert.

The only other testimony as to whether or not the proposition to issue mortgage certificates or turn over any assets to Mrs. Reinert was discussed at either the alleged informal meeting of the company's directors on September 25, 1931, or at their formal meeting on the morning of September 28, 1931, is that of Mr. Soule, who had at a former time been

secretary and was still a director of the company. He thinks that there were two or three meetings in September, 1931, at which Jackson, Porter, himself, and he thinks director Montgomery, were present, at which he says that the issuance of certificates to Jane V. Reinert was discussed in Mr. Porter's presence and her deposit of moneys with the company mentioned. He thinks that the matter came up again at the meeting of September 28, 1931, and that the Ewing contract ''was presented at that meeting and was entered into by the Board of Directors''. The effect of his testimony is that at this meeting the issuance of the mortgage certificates to Mrs. Reinert was authorized. With reference to this meeting of September 28th he testified further as follows:

''Q. Will you relate the statements made relative to that contract, the Ewing contract?

''A. As near as I can remember, Mr. Jackson reported that the different parcels of land which had been previously discussed in reference to the Ewing contract had been gone over and that the actual form of the contract itself had been assembled and was ready to be executed. He either said it had been executed or was about to be executed or was to be executed, I don't know.

''Q. Was Mr. Porter present at that time?

''A. He was.''

Jackson testified that D. W. Montgomery, who, until his resignation on the afternoon of September 28th, was a director and who at that time was secretary of the corporation, carried the Reinert certificates over to the Depositary and had them authenticated, and the record shows that Montgomery in his capacity as secretary joined on that day in the execution of the assignment to the Depositary of the Ewing contract. Montgomery, however, is dead, so that the trial court did not have the benefit of his testimony about what action was or was not taken by the board in connection with these matters.

Whether or not, in actual truth, anything was ever said about this Reinert settlement or about the Ewing transaction at either the board meeting of September 28th or at any previous meeting, formal or informal, it is at least certain that all mention of these matters was omitted from the minutes and that no resolution or vote upon them by the board of directors is of record. There was a fifth director of the corporation prior to the reorganization of the board on the afternoon of

September 28th, one Guy Sawyer, who was not present on the morning of September 28th and apparently not present at any other meeting or conference of the directors in that month.

■ In proceeding, then, to deal with Mrs. Reinert's claim that the evidence does not support the findings, it will be convenient to first discuss those findings that we have quoted *in extenso*. Referring to the above-quoted finding 17, it is beyond dispute that the Company was, in and for some time prior to September, 1931, *insolvent* in the sense of being unable to pay its debts as they became payable. (*Washburn* v. *Huntington,* 78 Cal. 573 [21 Pac. 305] ; *Sacry* v. *Lobree,* 84 Cal. 41, 48 [23 Pac. 1088] ; *In re Ramazzina,* 110 Cal. 488 [42 Pac. 970].) It could not, with only some $28,000 on hand in money, meet the $80,000 presently due the two Santa Barbara banks, not to speak of its other unsecured creditors, as is fully acknowledged in its minutes of September 28, 1931. Even if it had nonliquid assets that at a fair valuation ought to have largely exceeded its liabilities it had no assurance that it would not be required to sacrifice them for a small part of their nominal value. The court did not find that it was bankrupt but that it was in "imminent danger of bankruptcy." We think this finding justified. The finding, indeed, goes too far in saying that the Company was then unable to pay "any part" of its debts, but this statement is unimportant for nobody claims that it could then have paid even the greater part of those with which it was at the time confronted. The trial court evidently believed that some sort of a directors' conference occurred on September 25th at which this situation was discussed. While Porter seems to remember no conference as having occurred on that day there was evidence which might reasonably have led the court to believe that such a conference did occur at which there was a general discussion of the Company's indebtedness. We note that this finding 17 at a later point asserts that Jackson obtained Ewing's execution of his contract to buy the nineteen parcels of the Company's land "without notice to any of the other officers or directors of the Company". The contract bears date September 26th. The only documentary evidence connecting any officer of the Company other than Jackson with the transaction is Montgomery's signature as secretary on the assignment of this Ewing contract to the Depositary,

together with the fact that Montgomery also attested for the Company the mortgage certificates in controversy, and, as to that assignment we notice that it is not written or typed on the contract itself but carried as a rider, now attached to the contract by wire staples, which in itself would do as well for an assignment of any other security. It bears date September 28th. Just what were the circumstances under which he attested the certificates, and under which he signed this rider or how it came to be attached to the contract, we cannot know from Montgomery's lips. The trial court was not obliged to believe Jackson's statement that Montgomery was the one who carried the Ewing contract with the assignment over to the Depositary and obtained its authentication of the Reinert certificates. As to whether the Reinert and Ewing transactions were ever mentioned in the conference of September 25th or the meeting of directors on the morning of September 28th there is a conflict of evidence. Jackson and Soule say that they were and Porter says that he heard nothing of them until later. The trial court was at liberty to believe Porter's account and disbelieve those of Soule and Jackson. Although the finding that Jackson's maneuvers in connection with these matters were without notice to the Company's other officers and directors is pretty sweeping, then, we cannot say that it is without support in the evidence. Even though it were conceded, however, that Soule and Montgomery were fully cognizant at the time of what was going on and participated therein, that would not amount to any actual authorization of this transaction by the board of directors in its capacity as such, nor have the same effect, and in view of the silence of the minutes on the subject and of Porter's testimony that no such action was taken, we think the trial court entirely justified in believing it to be the truth that there was no authorization. While the corporate seal on the assignment, attached as a rider to the Ewing contract, affords some evidence that such assignment was executed by competent authority, it is not conclusive proof thereof and the trial court was, in the circumstances, entirely justified in regarding its presence as of small importance. Outside of the features of finding 17, above discussed, we find nothing in it that the evidence does not fully support.

Assuming, once more, that the trial court believed Porter's account to the effect that the transactions just discussed were

never mentioned at directors' conferences or meetings, as against the testimony of Jackson and Soule that they were, we can find nothing in the finding 18 hereinbefore set out which is not sustained by at least some evidence in the record.

We find nothing even disputable about the determinations made in the above-quoted finding 19, other than what is therein said to the effect that there was no reference to Mrs. Reinert or the transactions pending with her, or yet to the Ewing arrangement, at either the conference of the Company's directors on September 25, 1931, or at their meeting on the morning of September 28th. There again it is simply a case of the trial court's having believed Porter rather than Jackson and Soule and we cannot say that it was wrong in so doing.

The above-quoted finding 20 appears to us to be in every respect sustained by the evidence, nor do we find any fault with the characterization of the ten accounts therein referred to as "uncertain". Except as hereinbefore stated the source of the moneys deposited under them with the Company does not appear in them, and could not be ascertained from any examination of them.

Finding 21 is not entirely correct, in that the evidence does show that there had been a former transaction on the Company's part with Mrs. Reinert involving an item of $5,000 not mentioned therein, whereby she bought a trust deed from the Company, but that has no connection at all with the present controversy and the omission of any mention of it is unimportant. Otherwise the finding, so far as it relates to the Company's books and records, is right. Except for the said $5,000 transaction and the $2,000 transaction referred to in the finding there appears to have been no mention therein of Mrs. Reinert prior to September 28, 1931. If those two transactions are left out of account, the correctness of the finding, which negatives generally the purchase by Mrs. Reinert from the Company of any mortgages, deeds of trust, or mortgage certificates, except as specified, or her payment therefor, is, of course, dependent, at least in part, upon the correctness of the trial court's view that the money in the ten accounts that figure so largely in the discussion was not her money, and that Jackson's testimony as well as such account as she undertook to herself give of the matters are unworthy of credence. This, so far as her appeal is concerned, goes to the gist of the case.

We think the trial court entirely justified in its view of the matter. Though it is claimed that Mrs. Reinert's funds were deposited with the Company in sums both large and small, pretty continuously from 1927 on until September of 1931, not a returned check, draft, voucher or scrap of paper of any sort has been produced to substantiate Jackson's account of what was done or her own vague statements about it, or to show that she ever advanced or deposited a cent. Neither did any bookkeeper or clerk in the Company's employ at any of those times testify to ever handling any particular one of her remittances or shed any sort of light upon the form in which they came; and this is true notwithstanding that Duncan P. Jackson, who, as we saw, is Fred D. Jackson's son, is shown during some months prior to September, 1931, to have handled the Company's bookkeeping and notwithstanding that during the same period he had Mrs. Reinert's power of attorney. During this whole period Mrs. Reinert's name is omitted from each and all of the ten accounts in question on the Company's books, and if it be assumed that the money was hers there is no reasonable explanation given for the omission. Two of the accounts are, without any apparent necessity for it, kept in fictitious names. Mrs. Reinert's husband, though said to be the person who made these extensive deposits for her and the one who, if her account were true, ought to have been able to supply all the details, appears from the record to be a resident of the county adjacent to that in which the trial occurred and despite the size of his wife's claims involved and the long time that the case was pending and repeated continuances of the trial itself, he was not produced to testify in her behalf. Neither was his deposition taken, and the trial court was left to draw its own deductions from his unexplained absence. Nobody in the Company except Jackson claims to know any of the particulars about Mrs. Reinert's deposits and his testimony, voluminous though it be, is, as to the exact form in which they were received, very far from circumstantial. No explanation is offered for the circumstance that, though the Reinerts were themselves interested in the Associated Almond Growers and Mr. Reinert was vice-president of that concern, either he or Mrs. Reinert should, instead of loaning money to it directly at such interest as they might think proper, have preferred to deposit the money with the Company, to be loaned by it to the Almond Growers

at twelve per cent per annum, while it credited Mrs. Reinert's deposits with only seven per cent. It does not appear that between 1927 and September 1931 any accounting was made by the Company to Mrs. Reinert or any interest on her alleged deposits actually paid to her or to anyone else, and though it appears that $19,515.40 in the aggregate was credited during this period as interest to the ten accounts referred to, it does not appear that she ever really drew a cent of that. The evidence shows without conflict that, after the transactions of September 28, 1931, Jackson procured from Mrs. Reinert a paper purporting to authorize him to pledge and that he actually pledged the certificates issued in her name to a bank for an old debt of his own. Respondents suggest that, during the latter part, at least, of the period involved, the Company sustained a heavy operating loss, as shown by the audit known in the record as exhibit 23. The evidence, of course, does not trace any connection, if any there be, between such loss and the sums deposited in the ten accounts under discussion. Certainly, however, the combination of circumstances that we have recited did impress, and could hardly have done otherwise than to impress the trial court as needing explanation when coupled with Fred D. Jackson's feverish anxiety in September of 1931 to carry through the transactions that were consummated on September 28th of that year.

Jackson testified vaguely that his own interest (by which we take it that he meant the interest held by himself and his wife) in the fictitiously named Jones account had been segregated, that is, set apart from any interest therein that may have been attributed to Mrs. Reinert. He could not give the details, nor is it made to appear how, or to what extent such segregation affected the amounts of the allotments made on September 28th to Mrs. Reinert based on the net balance shown on that date in the ten accounts. Jackson says that he "drew some cash" and that "my interest was pretty well wiped out if not entirely". The credit balance in the Jones account having been $19,374.80, the trial court may well have inferred that the cash he drew accounted, to practically that extent, for the disbursements made on that day out of the $28,000 shown to have been on hand when the day started. Jackson testified also that according to his belief Mrs. Reinert had not been interested in the Alice P. Jackson account, in which the credit balance as of September 28th was $35,004.68,

but that the account belonged to his wife and that her interests therein were conserved by her retention of an interest in the mortgages (not mortgage certificates) in form assigned by the Company on September 28th to Mrs. Reinert. It is at least apparent from this testimony that neither the cancellation of any interest not belonging to Mrs. Reinert herself in the Jones account, nor yet any cancellation of the Alice P. Jackson account could have provided any part of the consideration for the issuance of the mortgage certificates here in litigation.

There can, of course, be no question that a great number of deposits aggregating very large sums were from time to time actually made in cash or its equivalent in various banks at Santa Barbara to the credit of the Company and carried by it in the ten accounts under discussion, nor is there any doubt that the net balances payable to whoever may have been beneficially interested in these accounts, according to the Company's books, amounted immediately prior to the transactions of September 28, 1931, to the above-stated sum of $133,770.50, though the Company was, of course, in no position to pay any such balance in money. It is not incumbent on this court to resolve the mystery as to who made those deposits or to whom the credit balance of $133,770.50 belonged. We do now hold that the circumstances recited, with such inferences as might fairly be drawn from them, were enough to justify the trial court in believing that Mrs. Reinert did not furnish the money so deposited and was not entitled to any part of the said credit balances, and that, therefore, there was no consideration *emanating from her*, for the mortgage certificates issued in her name involved in the present litigation. Insofar, therefore, as the said finding 21 determines that she did not pay for those certificates it must be sustained. We also think that it must be sustained in its determination that she did not *purchase* them (otherwise than by subsequently ratifying what Fred D. Jackson undertook to do). True, Fred D. Jackson testified that he communicated with her on the subject on September 28th by telephone but she in her deposition disclaims any recollection of such a telephone conversation. The court had the right to believe that the whole transaction was initiated and carried out without any previous authority from her by Fred D. Jackson with the assistance of any others connected with

the Company or the Depositary who may have been induced by him to participate in it. True, Duncan P. Jackson held Mrs. Reinert's power of attorney but there is no evidence that that he acted in this connection for her under it.

We think that the evidence sufficiently supports the finding numbered 22 which we have quoted except for its omission of any reference to Mrs. Reinert's $5,000 trust deed purchase, which is immaterial in the present litigation. It also supports the above-quoted finding 23. We hold also, upon grounds already stated that it supports the above-quoted finding 24 in its entirety. This indeed goes further than the finding 22 hereinbefore discussed, in that it determines not only that Mrs. Reinert paid no consideration for the mortgage certificates referred to but that they were issued without any consideration at all. True the mere existence of such writings in the hands of others than the corporation issuing them is some evidence of a consideration but such evidence is not conclusive nor was the trial court bound to accept it. So far as any pretense is concerned that there was other consideration for their issuance than the cancellation of such interest in those ten accounts as Mrs. Reinert claims to have owned, it is without substance, since, as has just been seen, no interest which, according to Jackson, either he or his wife had in the Jones and Alice P. Jackson accounts entered into such consideration. Both Fred D. Jackson and Alice P. Jackson have, indeed, made a record disclaimer in the instant case of any interest in the certificates issued to Mrs. Reinert, but that does not mean or tend to show that any interest which they admit having had in any of the accounts discussed made up any part of such consideration. On being asked whether there was any writing transferring the ten accounts to Mrs. Reinert, Fred D. Jackson testified, ''There was not at the time. In January of 1932 such a writing was presented to the Mortgage Company.'' That, of course, was long after the discussion under review occurred, and the paper referred to was not produced, nor is it apparent what consideration it could have furnished for the mortgage certificates in litigation even if it be believed to have existed.

It is true, of course, that if anybody proved to have owned these ten accounts or any part of them shown to have been treated as any part of the consideration for the mortgage certificates issued to Mrs. Reinert, has assigned them to her,

then the cancellation of such accounts or parts thereof might be regarded as actually amounting to such consideration. But the trial court did not believe that the accounts originally belonged to Mrs. Reinert, and it was justified for the reasons above stated in believing that such interest as the Jacksons legitimately held in them, whether in name transferred to Mrs. Reinert or not, formed no part of the consideration for the certificates. If, however, it be said, as indeed it must be, that the accounts belonged to somebody, then if Mrs. Reinert was not that somebody, no connection appears between the actual owner or owners and Mrs. Reinert. We need not follow respondents' counsel in their intimations that the bulk of the credits in these accounts really belonged to the Company itself or that Fred D. Jackson was seeking personally to profit in some way from them. All we need say is that apart from the limited interest that the Jacksons admit having had in two of them we do not know, neither can we determine from the present record, nor need we determine in disposing of Mrs. Reinert's appeal, who other than she did own them.

So far as the Ewing contract was concerned it is manifest that it was a mere sham and entirely apart from the circumstance that the Indenture and Permit did not authorize the use of executory contracts of sale as collateral, that it could have afforded no actual consideration whatever justifying the authentication of the Reinert certificates here involved. ■ We therefore hold that the evidence supports the above-quoted finding 25, and for reasons hereinbefore sufficiently stated that it supports the above-quoted finding 26. Counsel for appellant complain very bitterly of the characterization of Fred D. Jackson in this finding 26 as Mrs. Reinert's agent, upon which we suppose respondents' counsel have insisted in order to charge her with knowing what Jackson knew about the Company's financial condition. We think it is true that there is nothing in the evidence to show that Mrs. Reinert ever in truth authorized him in advance to act for her. Nevertheless he did, in September of 1931, to all intents and purposes assume to do so, and, since she now adopts and relies upon what he did, her whole conduct in connection with the certificates issued to her and with the current litigation, is in substance and effect a ratification of his agency for her (Civ. Code, sec. 2307; *Brown* v. *Rouse,* 104 Cal. 672 [38 Pac. 507] ; *B. & W. Engineering Co.* v. *Beam,* 23 Cal. App. 164 [137 Pac. 624]),

and as such relates back to the time when he undertook to act in her behalf. (*Taylor* v. *Robinson*, 14 Cal. 396; *Wittenbrock* v. *Bellmer*, 57 Cal. 12; *Market St. Ry. Co.* v. *Hellman*, 109 Cal. 571 [42 Pac. 225].)

■ The Indenture, of course, did not contemplate that the proceeds of any particular part of the securities assigned to the Depositary should be allocated to the payment of any particular mortgage certificate or mortgage certificates. Until such time, therefore, as the mortgage certificates issued on September 28, 1931, to Jane V. Reinert should be cancelled or eliminated from the list of certificates treated as valid, it is clear that the deposit as part of the collateral necessary to make up the aggregate required to permit such Reinert certificates to be added to the other certificates previously issued and authenticated, of any such mere sham as the Ewing contract tended to prejudice the rights of all prior certificate holders. For that reason we hold the above-quoted finding 27 justified and for reasons already sufficiently stated we hold the above-quoted finding 28 to have been also justified.

An attack is made upon various findings, including those numbered by the trial court, 8, 10, 16, 39 and 40, which we do not take the space to quote, insofar as their net effect is to determine that the Company's outstanding certificates, other than those issued to Mrs. Reinert, were sold and issued for cash paid to the Company, in the amount of their respective par values, at the dates when they were respectively issued. It must be conceded that in respect to the consideration for certain of these certificates the court's findings are not literally correct. For reasons that we shall hereinafter discuss we do not regard this inaccuracy as of serious importance.

■ Complaint is also made of a finding (numbered 7) insofar as it determines that from the time of the organization of the Company until February 11, 1930, W. S. Porter and Fred D. Jackson dominated and controlled the said Company, its business and affairs, and that from February 11, 1930, until January 8, 1934, the said Fred D. Jackson dominated and controlled the Company. Reference has already been made to the circumstance that Porter and Jackson successively occupied the office of president of the Company. There is no dispute that each acted successively also as its manager. There is no dispute that they owned all of its common stock. We think it tolerably clear, therefore, that regardless of the

fact that there were other directors, they substantially controlled its policies until Porter left Santa Barbara for Los Angeles, and that Jackson was mainly active in their control thereafter and up to the time of the reorganization of the board of directors on the afternoon of September 28, 1931. We do not mean by this that the other directors were excluded from participating in its affairs but merely that Porter and Jackson appear successively to have been mainly active in its management. That Jackson, during the latter part of this time, took upon himself much of the responsibility for what was done, is, among other things, shown by his management of the very ten accounts with which we have been here concerned. Nobody else connected with the Company seems to have been able to give much information about these notwithstanding the unusually large amounts of money involved. It is true that after the reorganization of September 28, 1931, there were representatives of the two banks on the board and it may be assumed that they participated in shaping the Company's action so far as they deemed such participation beneficial to the special interests represented by them. We do not know, however, that the evidence shows that their interest in the Company extended beyond that. Altogether then we think that to the extent this finding is material it is not unsupported by evidence in the record.

We have not undertaken to deal in detail with all of the trial court's findings nor to discuss all of the strictures upon them made by Mrs. Reinert's counsel. Undoubtedly there are various overstatements and inaccuracies in them. None of these, however, appear to us to be of such importance as to affect the result of the case. We therefore proceed to discuss certain propositions of law advanced in Mrs. Reinert's behalf.

■ It is claimed that no consideration was required or necessary for the issuance of the Reinert certificates by the Company, otherwise, at least, than as such requirement was made by the commissioner's permit, and that such lack of consideration cannot, of itself, establish the invalidity of such certificates without a further showing of fraud, duress or mistake. The argument in support of this somewhat startling suggestion is that the mortgage certificates ''do not constitute promissory notes or bonds of any kind'', but amount to ''nothing more than a sale of individual interests in the securities on deposit with the Depositary with the

promise or option of repurchase by the Company''; that the arrangement for their issuance is an executed one and that, therefore, there is applicable to it section 1040 of the Civil Code providing that:

''A voluntary transfer is an executed contract, subject to all rules of law concerning contracts in general; *except that a consideration is not necessary to its validity.*'' (Italics those of appellant's counsel.)

We agree with respondents that this statutory provision is inapplicable. It cannot, of course, be doubted that the certificates were intended to represent sales to the holders named therein of the right to participate *pro rata* in the security afforded by the arrangement for the aggregate total of their investments. It is equally certain that none of them acquired any interest in specific notes, mortgages or deeds of trust in the hands of the Depositary. Their interest was rather in an abstraction, that is a *fund,* represented by whatever notes, mortgages or deeds of trust might be on deposit at any particular time, there being no limit to the number of changes permitted or in the number of units making up this deposit. Their sole security consisted at all times in the *obligation* of the Company to keep an adequate total of proper notes, mortgages and deeds of trust on deposit and the reciprocal *obligation* of the Depositary to require it to do so. So long as the Company was not in default, the notes, mortgages and deeds of trust making up the *corpus* of the deposit were entirely beyond their reach, the payment of the interest on their investment was purely an obligation of the Company and they could recoup their principal only by calling on the Company to repay it, though such recoupment is in form described as a repurchase, by the Company, of their interest in the securities. In the event of the Company's default their only recourse was to insist on a liquidation of the securities through the Depositary amounting in practical effect to a foreclosure. Looking through matters of mere verbiage, we think, then, that what the certificate holders purchased was primarily the Company's obligation to pay them the interest on their investments and to ultimately repay the principal thereof, and secondarily the obligation of the Depositary, in the event the Company should default, to proceed to liquidate the securities and to pay them their *pro rata* shares of the proceeds up to the amounts necessary to satisfy what should be due them.

Substantially then, the mortgage certificate represented those two obligations rather than any true assignment of property and the transaction evidenced by it is not within the purview of the code section. We have, thus far, not considered, in this connection, the requirements of the commissioner's permit which were, of course, in the issuance of the Reinert certificates, flagrantly disregarded.

The next proposition insisted on is that the Company cannot lawfully question the validity of Mrs. Reinert's certificates on the ground of lack of consideration or on any other ground, and that evidence was inadmissible on behalf of the Company in attempting to attack the validity of the certificates. The argument under this head is, briefly, that in spite of numerous fraud charges made by the complaint against the Company and against Jackson, it makes none specifically against Mrs. Reinert, that it is the law that recitals between the parties to an investment, of a consideration, may not for the purpose of avoiding their legal effect be contradicted except on grounds of fraud or duress, and that therefore evidence was wholly inadmissible in any effort to show that there was no consideration for the certificates. (Citing such cases as *Winchester* v. *Winchester,* 175 Cal. 391 [165 Pac. 965], and *Arnold* v. *Arnold,* 137 Cal. 291 [70 Pac. 23].) The obvious answer is that, even though Mrs. Reinert may not be charged with being initially a party to the fraud, as in fact she very probably was not, since it is likely that she knew nothing about the transactions of September, 1931, until after they had occurred, yet she has, since their consummation sought, and still, by her pleadings and position seeks actively to take advantage of them and by doing so to profit from whatever frauds were committed, which is tantamount to a ratification of them. (*Goldsmith* v. *Koopman,* 152 Fed. 173; 27 C. J., pp. 11, 12, and cases cited under note 86.)

The further claim that though those transactions were fraudulent the Company is, in consequence of its complicity, *particeps criminis* and, therefore, in no position to complain of them, would carry with it more plausibility if any authority from the board of directors, in its capacity as such, for what was done were established, but since on evidence that was conflicting the court has found in effect that there was no such authority given but that what was done was the mere fraudulent act of an executive officer, we see no reason why the Com-

pany should be precluded from seeking relief, especially as Mrs. Reinert is in no position to claim any estoppel *in pais* in her favor.

Equally without merit is the claim that the plaintiffs-respondents are without standing to attack the Reinert certificates. The Reinert brief concedes that they might do so, were they able to found such an attack *"on the ground that the Company had no interest in the security on deposit with the Depositary to convey under the Reinert certificates at the time of their issuance and has subsequently acquired no interest in such securities which would come under the operation of the conveyance in the Reinert certificates"*. Apparently the point sought to be made is that such respondents, at the time they commenced their action, were not parties to the certificates, were not judgment creditors of the Company (12 Cal. Jur. 74, note 10) whose right to be satisfied out of any specific property of the Company or their debtor was being delayed or obstructed by the existence of the Reinert certificates, and, therefore, had not, under authority of section 3441 of the Civil Code, any right of action to set aside such certificates as fraudulent conveyances; that they were in no proper sense general creditors of the Company, or persons upon whom the estate of the Company devolves in trust, so as to give them right of action to set aside the Reinert certificates under either section 3439, section 3440 or section 3442 of the same code, and, therefore, not entitled under these enactments to set aside the said certificates as transfers made with intent to delay or defraud creditors; and that they could not, of course, attack the certificates under section 1227 of that code since the certificates were not real estate. Plaintiffs-respondents were not, of course, at the time they commenced their action, judgment creditors of the Company, and it may, moreover, be true that they have not brought themselves within the provisions of sections 3439 and 3442 of the Civil Code on any theory that the Ewing transaction tended to impair the Company's ability to pay the interest from time to time accruing on their certificates or to carry out its obligation to redeem the certificates themselves when required to do so, inasmuch as their recourse, in the event of such default was, under the terms of the Indenture, to be to the securities then in the hands of the Depositary. We think, however, that the Reinert brief misconceives the gist of the

complaint that these other certificate owners make. It is that the fund that they were entitled to look to for their security was, by the transactions complained of, adversely affected in two ways: first, by admitting Mrs. Reinert in the event of a default to participation in all of the securities, good and bad, in the hands of the Depositary and thereby reducing their own proportion of what would be realized from the good securities in the event of a liquidation; and, secondly, by diluting through the deposit of the fictitious Ewing contract the fund in the Depositary's hands so as greatly to increase its content of nonliquid assets to the detriment of the certificate holders generally in the event of such liquidation. We hold, therefore, that the property rights of plaintiffs-respondents as certificate holders were clearly infringed by the tortious conduct of Fred D. Jackson and whoever else participated with him in bringing about the deposit of this Ewing contract and the issuance and authentication of the Reinert certificates; that Mrs. Reinert having ratified these transactions has become to all intents and purposes a party to them; that the Company having defaulted in its obligations to the certificate holders generally, the existence of the certificates improperly, and as the trial court has found fraudulently, issued to her, is an impediment to the resort by the other certificate holders to the securities lawfully in the hands of the Depositary when the default occurred, and that having no adequate remedy at law, such other certificate owners have rightfully sued in equity to have these Reinert certificates cancelled.

Recurring, now, to the corporation commissioner's permit, it is to be noted that it permitted the mortgage certificates to be issued "at par for cash, lawful money of the United States, so as to net the applicant the full amount of the selling price thereof", also that the same might be authenticated, issued and sold only in accordance with the terms and provisions of the Indenture, and that these requirements have been disregarded and violated in the following particulars:

That the Reinert certificates were not sold for cash, in lawful money of the United States, but that the alleged consideration for them was the cancellation of accounts claimed to represent balances due Mrs. Reinert from the Company in consequence of its handling of her funds through a period of four years more or less, and that the trial court

has on sufficient evidence found that these accounts were not the property of Mrs. Reinert;

That whereas the Indenture required the assignment to the Depositary of notes secured by *mortgages* and *deeds of trust,* accompanied by guaranties, abstracts or policies of title insurance showing them to be *first liens* upon the properties therein described, aggregating not less than 110 per cent of the total amount of mortgage certificates at any time outstanding, and that mortgage certificates should only issue when accompanied by the Depositary's authentication certifying, among other things, that these conditions had been complied with, even prior to the time the Reinert certificates issued the Company had persistently failed to live up to that requirement in that, although it commonly kept in the hands of the Depositary assets of an aggregate par value of more than 110 per cent of the certificates outstanding, yet at all times after its issue back in 1925 of the first certificate its deposits of collateral were made up in large part of executory contracts of sale, which were not securities permitted by the Indenture, but without which the aggregate of securities deposited would at practically all times have been less than the 110 per cent requirement;

That the situation last described would have been aggravated by the deposit of the Ewing contract and the concurrent issuance of the Reinert certificates, even had the Ewing contract been genuine, since after that transaction had been consummated the aggregate of certificates outstanding amounted to $169,207.45, which, with the 10 per cent addition, required a deposit of collateral aggregating $189,706.25, of which only $88,180.15 was then actually represented by first trust deeds, no less than $101,271.10 being represented, in violation of the Indenture and permit, by executory contracts of sale, and $225 by second trust deeds or second contracts;

That not only was this result on its face irregular, but the fact was that the Ewing contract of sale was only a *simulacrum,* made in bad faith, never intended to be carried out, and unenforceable otherwise than by recouping the land described in it;

That even the subsequent attempt of the Depositary to protect its holding of collateral by obtaining the Company's notes secured by its own deed of trust on the same property affected by the Ewing contract, failed to result in any

regularization of the situation, since the first mortgages and deeds of trust which the Indenture contemplated should be assigned by the Company to the Depositary were patently not to be the Company's own obligations but obligations *held* by it and so capable of *assignment* as collateral, for the performance of its obligations to the certificate holders.

The record shows, also, that the Indenture was further violated in connection with the deposit of the Ewing contract in that no pretense was made of furnishing the Depositary with any evidence of the state of the title to the lands affected; and it further appears that the appraisement of this property furnished, instead of being made by an entirely disinterested party was made by an appraiser who was himself indebted to the Company and therefore under obligation to it.

The date of the corporation commissioner's permit was January.24, 1925. At that time there was in effect the Corporate Securities Act of 1917, which provided in section 12 that corporate securities issued without a permit or in violation of a permit are void; in section 13 that any company issuing securities contrary to or in nonconformity with the act or applying the proceeds of sales thereof otherwise than in accordance with the permit authorizing the issue is guilty of a public offense; and, in section 14 making criminal the act of any officer, agent or employee of a company or any other person authorizing, directing or aiding in such issue. Certain amendments to this act were made by the legislature of 1931 effective on August 14th of that year. Under sections 17 and 18 of the act, as so amended, in lieu of the said *former* provisions of sections 12 and 13 the issue or sale of securities contrary to the provisions of the act or in nonconformity with permits issued thereunder, by a company or any officer, agent or employee thereof continued to be a criminal offense. Among changes made by this amending statute was the deletion of *former* language of section 12 making wholly void securities issued in violation of the act or in nonconformity with the permit issued. A new provision in section 16 makes such irregularly issued securities voidable at the option of the holder or purchaser thereof unless the commissioner within 60 days after notice of the irregularity shall issue a subsequent permit legitimatizing them, but providing that, in case he does so, the circumstance that they were issued without a permit or in nonconformity

with the permit shall not make them voidable. The briefs contain considerable discussion of the effect of these amendments which, of course, became effective before the Reinert certificates issued, and the claim is made on behalf of Mrs. Reinert that the elimination of the former provisions of section 12 and the insertion of the provisions above referred to in section 16 result in making the certificates issued to her immune from any attack based merely on violations of the permit unless she chooses to make such attack herself. In this connection, however, it is to be observed that by far the greater part of the certificates held by others than Mrs. Reinert issued before the change in the law, that the Indenture was a contract to which they, in effect, became parties, and that the law, as it stood when their contractual rights were acquired entered into and became part of their contracts. When they invested in certificates then it was their statutory, and therefore their contractual, right to treat any issue of the Company's certificates not made in substantial conformity with the permit as void. No subsequent statute could impair that right or deprive them of any means of enforcing it. (*Robinson* v. *Magee,* 9 Cal. 81 [70 Am. Dec. 638]; *Spencer* v. *Houghton,* 68 Cal. 82 [8 Pac. 679]; *Welsh* v. *Cross,* 146 Cal. 621 [81 Pac. 229, 106 Am. St. Rep. 63, 2 Ann. Cas. 796].) ■ We think, then, that while it may be conceded, as claimed by Mrs. Reinert's counsel, that the violation of the commissioner's permit is, under the amended statute, not one of the grounds available to the Company for attacking the Reinert certificates, it nevertheless is a ground for such attack available to holders of valid certificates issued prior to the amendment of 1931.

■ As has been observed, however, in our foregoing discussion of Mrs. Reinert's attack on the findings, the claim is made in her behalf that if the certificates issued to her are subject to question on the part of the other certificate holders for violation of the corporation commissioner's permit, many of the certificates held by the plaintiffs-respondents are subject to attack for the same infirmity. The situation seems to be that among them are twenty-two that were issued in consideration of the surrender of earlier certificates; that three were issued in consideration of the delivery to the Company of a trust deed in an amount equal to the aggregate of their sums; that one was issued for cash not fully paid until above a month after its delivery; and that another

was issued to cover accrued interest on other certificates. So far as the substitution of certificates was concerned, that involved no increase whatever of the Company's obligations. As respects the certificates issued in consideration of the trust deed delivery, respondents' counsel assert that the Company subsequently collected the obligation secured by the trust deed in full. Though reference to the record is not furnished in support of it, that assertion is not disputed in the Reinert reply brief and we therefore assume it to be true. If so, the Company actually did receive the cash and the only real irregularity would seem to be that the certificate issued prematurely, an irregularity that may be treated as cured when the proceeds of the trust deed were actually realized. The same remark is applicable to the case of the certificate issued before it was fully paid for. While the issuance of the certificate in consideration of accrued interest on other certificates was apparently irregular, it was certainly not issued without consideration. In fine, there seems to be no dispute that the Company received full value for all of this group of certificates. In these circumstances *it* could not be heard to question their validity. (*Braunstein* v. *Title Guarantee & Trust Co.*, 216 Cal. 780 [17 Pac. (2d) 104]; *Security-First Nat. Bank of Los Angeles* v. *J. E. Ruddle Co.*, 218 Cal. 435 [23 Pac. (2d) 1016].) Patently the Depositary, after authenticating the certificates, is in a practically similar position, and as is said in the brief for the plaintiffs-respondents: ''Neither the plaintiffs nor any of the other parties directed under the terms of the decree to recover, are questioning among themselves the regularity of their own various certificates.'' We do not think Mrs. Reinert in any situation to question them. With a single exception every one of them was issued prior to those which she claims and its issue constituted, therefore, no impairment of any preexisting right of hers. The one—that numbered 456 for $1200—later in date than those which she received is included in the number substituted for earlier certificates and therefore could have resulted in no increase of the outstanding total to her detriment. It is entirely true that all of these certificates subsequent to the very first one, were issued in violation of the terms of the Indenture in that, as already observed, part of the securities delivered to the Depositary and included in the aggregate against which certificates issued, consisted of executory contracts for the

sale of lands, so that the aggregate of first mortgages and first trust deeds on deposit constantly fell short of the required total, but the evidence does not show that the certificate holders bought with any notice of that situation and the Depositary's certificate of authentication attached to each certificate was well calculated to disarm any suspicion that such a situation existed. For the purposes of this decision, therefore, the holders of the certificates other than those in litigation issued to Mrs. Reinert must be assumed to have bought them in good faith and without notice of this defect in collateral.

After considering this Reinert appeal, in its various aspects, we are constrained to say that we find no merit in it.

### The Appeal of the Depositary.

The Depositary, Security Title Insurance and Guarantee Company, disputes the correctness of so much of the decision and judgment as imposes upon it, together with the Mortgage Company, liability to those adjudged to be holders of valid certificates for any deficiency in the amounts due them that may remain unpaid upon the completion of the liquidation of the deposited certificates now in its hands. ■■■ We observe that the Depositary's notice of appeal is, in terms, from the judgment "and from the whole of the said judgment", so that we are invested with jurisdiction to review any and all features of the judgment that affect it. The opening brief for this appellant, however, disclaims any attack upon the validity of the judgment "in so far as it declares invalid the so-called Reinert certificates", or any claim "that the persons found by the court to be the holders of valid certificates are not in fact such holders of such certificates". Its main quarrel with the judgment is over the contingent liability imposed upon itself.

■■■ The Depositary calls specific attention to the form of mortgage certificate used, on the face of which, reference is made to the Indenture with the words: "This certificate is issued under and is subject to and the holder hereof does by the acceptance of this certificate consent to all of the terms, conditions and provisions of said agreement." The Depositary insists that the effect of this clause was to incorporate the Indenture in each mortgage certificate issued, to make each purchaser of a mortgage certificate in effect a party to the Indenture itself, to charge him with notice of

its contents, and to bind him by its various terms. (Citing *Bell* v. *Title Trust & Guarantee Co.,* 292 Pa. 228 [140 Atl. 900, 57 A. L. R. 463], *Davidge* v. *Guardian Trust Co. of New York,* 203 N. Y. 331 [96 N. E. 751], and *Preston* v. *Howell,* 219 Iowa, 230 [257 N. W. 415, 97 A. L. R. 1140].) These propositions are not seriously disputed by the plaintiffs-respondents nor do we dispute them. The Depositary then directs attention to the provisions hereinbefore quoted by us from article VII of the Indenture relative to the affidavits by officers of the Company required to accompany deposits of securities, and to the provisions of article XIV of the Indenture hereinbefore set out at large relieving it—that is the Depositary—from any responsibility for passing upon the validity of the securities deposited, permitting such Depositary to rely conclusively upon the affidavits referred to, and further exculpating the Depositary from any responsibility for any recitals or statements of fact made in the Indenture and declaring all such statements to be solely those of the Company. The brief then recites the language prescribed for the authentications and advances the further contention that the purchasers of certificates are. charged with making their investigations of the character of the securities on deposit and are "bound by the facts which such an investigation would have disclosed". That is, in our opinion a *non sequitur*. ▮ In the effort to substantiate this claim, however, various cases are cited in which a depositary as trustee has merely certified upon a bond or obligation substantially that it is one of a series of some given number of bonds or obligations issued by some named concern or issued by it under the terms of some given instrument. In such cases, which are numerous, it is pretty uniformly held that the certifying depositary or trustee makes no other, further or different representations from that which the language of the certificate imparts. Such cases are *Ainsa* v. *Mercantile Trust Co.,* 174 Cal. 504, 508 [163 Pac. 898]; *Bell* v. *Title Trust & Guarantee Co., supra; Byers* v. *Union Trust Co.,* 175 Pa. 318 [34 Atl. 629]; *Bauernschmidt* v. *Maryland Trust Co.,* 89 Md. 507 [43 Atl. 790]; *Davidge* v. *Guardian Trust Co. of New York, supra; McCauley* v. *Ridgewood Trust Co.,* 81 N. J. L. 86 [79 Atl. 327], all of which, with others, are, on behalf of the present Depositary, cited and relied upon. Many like cases might have been cited. For the most part, however, they seem to have little application here because

of the much more restricted language of the certificates which they involve as compared with that involved in the instant case. Of them it may well be said, as it was said in *Ainsa* v. *Mercantile Trust Co.*, *supra*, p. 512, that: "The purpose of the certificates was not to insure the sufficiency of the security. It was to prevent an overissue." In the instant case, on the other hand, the authentication goes beyond the mere representation that the mortgage certificate has been duly executed by the Company, or that it is one of those executed under the Indenture. It contains the further representations that: "as depositary under said escrow agreement the undersigned holds *the securities referred to in the within certificate* in the proportion of One Hundred Ten Dollars of said securities for each One Hundred Dollars interest as represented by this certificate; *said securities being held in accordance with and subject to the terms and conditions of said agreement*". Of the numerous authorities cited by the appellant to illustrate the limited scope given to authentications by depositaries or trustees, we find only one in which the words used are given any narrower import than the obvious one. That is the Massachusetts case of *Continental Corporation* v. *First Nat. Bank*, 285 Mass. 419 [189 N. E. 184], where the trustee certified that the "bond is one of the bonds described in a mortgage or deed of trust to the subscriber as trustee", giving the purported date of the instrument. Each of the bonds so certified to on its face contained the language: "to which mortgage or deed of trust reference is hereby made for a description of the property so deeded or mortgaged, the nature and extent of the security, the rights of the holders of the bond under the same, and the time and conditions upon which said bonds are issued and secured". There was in fact no mortgage or deed of trust of the date recited in the certificate, nor any deed of trust affecting real estate at all, though there was an unrecorded indenture, dated subsequently to the date of the certificate but before any of the bonds in fact issued, conveying to the trustee certain machinery and equipment as security for bonds without specifically designating the bonds secured. While this case goes further than any of the rest relied on, it is distinguishable from the one at bar by the circumstance that inquiry for the mortgage or deed of trust specifically referred to in the bond certified to, would have undoubtedly disclosed its nonexistence, whereas in the instant case there was nothing which is made by refer-

ence any part of the authentication or mortgage certificate which did not actually exist. The question before us, therefore, is whether, in the instant case, the purchasers of mortgage certificates are or are not entitled to rely on statements distinctly made on the face of the authentication which could be only given greater definiteness but not in any way contradicted, if the intending purchasers were with all diligence to read in full both the mortgage certificate and the Indenture referred to in it. We are in accord with the view that a representation in the certificate of a depositary or trustee ought not to be held to mean more than it says, but think that to be no reason for holding it to mean less than it says. Specifically, in the present case, we agree that, as provided in the Indenture, the Depositary had no responsibility for passing on the legal validity of the securities or the validity of any insurance policy, certificate, guaranty or abstract of title accompanying the same, as to their binding force upon the companies or persons issuing the same. Further, we agree that the Depositary, as further stipulated in the Indenture, was entitled to conclusively rely on the contemplated affidavits, to be submitted with the securities deposited, as to all of the matters which the Indenture specifies as to be covered by such affidavits, provided such affidavits were not contradicted by matters appearing on the face of the securities deposited, themselves. This does not, however, in our opinion, mean that the Depositary might lawfully close its eyes to the most obvious departures apparent from the merest glance, in the securities deposited with it, from the plain terms of the Indenture and the plain requirements of the corporation commissioner's permit; and, on the strength of such affidavits, proceed to certify to something manifestly contrary to the fact. More than that, the contemplated specifications of the affidavits included no statement that the securities to be submitted were of the classes contemplated by the Indenture, but were intended rather to assure the reader that they were in fact what they purported to be. We see no reasonable ground on which the Depositary could be justified in assuming or stating that they were of a description and class authorized by the Indenture, when they did not even purport to be securities of the authorized description and class. The Depositary here had certified and represented that it holds "the securities referred to in the within certificate". That meant notes and the debts repre-

sented thereby secured by first mortgages and first deeds of trust which, in our opinion, do not include executory contracts of sale. The cases cited in the effort to show that they do, do not seem to us in point. We hold, therefore, that when the securities held included executory contracts of sale, which had to be counted to make up the required totals, the representation of the Depositary that it held securities referred to in the mortgage certificate was a representation of that which was untrue and which the Depositary was charged with knowing to be untrue. Such certification, manifestly intended to facilitate the sale of the mortgage certificates, amounted in our opinion both to culpable negligence and to actual fraud within the meaning of subdivision 2 of section 1572 of the Civil Code, and was a breach of the warranty involved in the authentication. Neither the negligent aspect of the Depositary's conduct, however, nor the circumstance that, whatever its motives, its conduct amounted in law to a fraud, is the dominating feature of the cause of action against it. The net effect of its conduct was a breach by it of the contract, whether that be called an escrow or a trust, to which, in making these authentications, it became a party and held itself out as a party.

It is, indeed, claimed that even though the representation may have been false the certificate holders could complain of its falsity only if they proved their reliance in it. (Citing *Hallidie* v. *First Federal Trust Co.*, 177 Cal. 600, 603 [171 Pac. 431], and *Brewis* v. *Toffelmier*, 97 Cal. App. 329, 337 [275 Pac. 819].) That, as a proposition of law, is indisputable, but in our opinion the trial court was clearly justified from the situation presented in inferring that the certificate holders must have relied and did rely on the statements of the authentication. In the very nature of the case they did so. As counsel for the plaintiffs-respondents well say:

"If each separate investor was obligated to audit the collateral securities as to totals and character and supporting instruments, there would have been no need for an authentication and certification covering these elements by the title company. There was no clause in the indenture even contemplating or permitting such an audit. Such a precaution required of investors is utterly at variance with business practice and has never even been suggested before."

As is well illustrated by such cases as *Pollak* v. *Staunton,* 210 Cal. 656, 664 [293 Pac. 26], no such duty rests upon investors or is to be expected of them.

It is further claimed that "any defects which may have occurred were cured by action of the Depositary prior to the trial" of the present case. By this is meant the Depositary's action already referred to in obtaining from the Company on or about May 4, 1932, the latter's own notes for $51,015.32 and $33,412.17, together with the trust deeds executed by the Company to secure the same, affecting as respects the security for the $51,015.32, the same nineteen parcels of land embraced in the Ewing contract. The Indenture, however, by its terms contemplates the deposit only of "notes (and debts evidenced thereby) secured by mortgages or deeds of trust heretofore *owned* by the Company", and "other notes (and debts evidenced thereby) secured by mortgages or deeds of trust which will be owned by the Company". It does not include among the deposits authorized by it, any direct obligations of the Company. Therefore this attempt to supply the deficiency in the earlier deposit of authorized securities, was insufficient to bring about conformity with the requirements of the Indenture and permit. (*Conover* v. *Guarantee Trust Co.,* 88 N. J. Eq. 450 [102 Atl. 844].) So far as the Depositary may in the past have realized or may hereafter realize anything by foreclosure upon these new obligations of the Company and may lawfully apply the proceeds upon the sums due the holders of certificates adjudged to be valid, it may, indeed, reduce to that extent, or, by possibility entirely wipe out, any damage which they might otherwise be found to have sustained through its failure in the first instance to insist that the securities deposited be of the classes specified, but such arrangement for minimizing or obviating damages is, strictly speaking, outside of anything contemplated by the Indenture itself.

We are in agreement, then, with the respondent certificate holders that not only is the Company liable to them for such damages, if any, as they have sustained, but that the misconduct of the Depositary has made it also liable to them for the amount of any such damage. At this point, however, we are called upon to notice another contention on the Depositary's part. That is that it was incumbent on the trial court to ascertain at the trial whether or not any such dam-

age had been sustained rather than to leave it to be determined at the end of the process of realizing on the securities. Complaint is made that the certificate holders have not offered any evidence to show that they have sustained any damage and that evidence to that effect is wholly lacking. Contrariwise, in the effort to demonstrate that the certificate holders had sustained no damage, the Depositary offered to show that the assets in the several ways above outlined placed in its hands by the Company, largely exceed in value the amounts of the mortgage certificates outstanding and adjudged valid. . On objection the trial court refused to hear testimony to that effect and its refusal to do so is assigned as error.

We think these criticisms without merit. In *Conover* v. *Guarantee Trust Co., supra,* it was said:

"The rule of liability of a trustee who has transcended his powers is defined in 28 Am. & Eng. Enc. of Law, 1063, as follows:

" 'Trustees are bound to observe the limits placed upon their powers, either by law or by the trust instrument, and if they transcend such powers and cause damage to the estate they will be held responsible therefor, although they may have acted in perfect good faith.'

"Prof. Pomeroy defines every violation by a trustee of a duty which equity lays upon him, whether willful and fraudulent, or arising through negligence, or arising through mere oversight or forgetfulness, as a breach of trust, and declares the trustee's personal liability to make compensation for the loss occasioned by such breach of trust to be 'a simple contract equitable debt', and also that the amount of liability is always sufficient for the complete indemnification and compensation of the beneficiary. (3 Pom. Eq. Jur. #1062, 1079, 1080.) The distinction between a case in which a trustee has transcended the powers conferred by the trust and one relating to matters of judgment or conduct on the part of a trustee in transactions within the trustee's powers necessarily enters into all considerations touching a trustee's liability."

In the same case, which was strikingly similar in many of its facts to the one at bar, and involved a certification by a trustee that it held such securities for a bond issue as it was authorized to hold, when it had actually accepted others that it had no authority to accept, the court further said:

"The ordinary measure of accountability is recompense to the *cestuis que trustent* for the loss sustained by reason of the breach of trust. (*Polhemus* v. *Holland Trust Co.*, 61 N. J. Eq. 654 [47 Atl. 417]; Pomeroy's Eq. Jur., *supra*.)

"It is obvious that it is here impossible of even approximate ascertainment what losses have fallen to or will eventually be sustained by the collateral bondholders by reason of the breach of trust here in question, for the course of the trust, in the absence of the exercise of unauthorized power by the trustee, can never be known. In such circumstances, the trustee must be deemed to have assumed personal responsibility for such losses as should fall to the holders of the collateral bonds by reason of the securities which were improperly accepted by the trustee and made the basis of issued collateral bonds by reason of the trustee's certificate ultimately producing less in value than the amounts for which they were unlawfully accepted and certified. Although the trust agreement by its terms imposes no responsibility on the trustee for the value of the mortgages to be assigned to the trust fund, when the trustee assumed to accept for the trust fund mortgages not authorized for that purpose by the trust agreement and certified against such securities collateral bonds as issued pursuant to the trust agreement a just regard for the rights of collateral bondholders, who were privileged to rely upon the trustee's certificate, necessarily imposes upon the trustee the measure of liability already stated, in the absence of any possible means of ascertainment whether a loss would have arisen had the trustee performed its plain duties as defined by the trust agreement. That measure of liability alone satisfies the principle that the trustee 'acts at his peril' in transcending his powers. A suggestion that, had the Ventnor syndicate made conveyances of lots to dummy vendees and taken purchase-money mortgages and assigned them to the trustee, the letter of the trust agreement would have been satisfied, is without force; had the trustee been made acquainted with such procedure, the situation would have been unchanged. In this view the trustee must answer to the bondholders for such loss as they ultimately sustain by reason of the mortgages which were made to the trustee realizing less than the amount they were pledged to secure, unless the immunity clauses of the trust agreement shall be found to exempt the trustee from such liability."

The court, in the case referred to, then proceeded to discuss the immunity clauses of the trust instrument there involved, which also had many aspects of similarity to those in the case at bar, and held that they were insufficient to exculpate the trustee from responsibility for the misstatements in its certificate. The court, having held that in consequence of its breach of trust through the exercise of powers not conferred upon it, the trustee had rendered itself liable to the *cestuis que trustent* for such losses as might be found to have arisen by reason of the securities accepted realizing less than the amounts which they were made to secure, went on to say:

"This standard of responsibility renders it impossible to determine at this time the amount for which the trustee must account to the holders of collateral bonds; that can only be accurately ascertained at the final liquidation of the trust."

It is undoubtedly true as pointed out in such cases as *Doyle* v. *Chatham & Phenix Nat. Bank,* 253 N. Y. 369, 377 [171 N. E. 574, 577, 71 A. L. R. 1405], that no trust relation in favor of a purchaser of securities can arise where the certification precedes the purchase, until the purchase is made, but we do not see how that proposition is of any assistance to the Depositary here. It is true also that some decisions have undertaken to hold that depositaries or trustees were not under contractual liability for representations made in their certificates attached to securities offered to the public on the theory that at no time did any privity arise between them and the purchasers of the securities. This latter ground is taken in *Allen* v. *Kreitler,* 106 N. J. Eq. 402 [150 Atl. 844], which undertakes to distinguish *Conover* v. *Guarantee Trust Co., supra,* on the ground that, there, the defendant *issued* the securities involved. In reliance on this supposed want of privity the liability of the certifying company for its representations was, in *Allen* v. *Kreitler, supra,* held not to be contractual but to be based on simple tort. So far as *Allen* v. *Kreitler* is concerned we are not impressed with the reasoning employed. ■ One who makes representations knowing that the purpose for which they are sought must be to induce others to buy securities, is in the position of having made the continuing offer of a warranty that the representations are true. It is indeed no guaranty of the sufficiency or legality of the securities (*Doyle* v. *Chatham & Phenix Nat. Bank, supra,* and cases therein cited),

unless the certificate contains such a warranty in terms. It is merely an offer to warrant the truth of the certificate itself. Such offer, originally unilateral on the part of the maker of the certificate, when accepted by those who in reliance on it buy the securities becomes, in our view, a binding contract. Nor is the one who has made the certificate any the less a party to such contract than those who directly *issue* the securities. ▇ Neither is it material that the benefits of the contract inure mainly or even wholly to someone other than such maker of the certificate. It is elementary, in the law of contracts that the consideration need not involve a benefit to the promisor but that it is enough that it be a detriment to the promisee. The maker of the certificate can reasonably ask only that his or its liability be confined to such warranties only as the language of the certificate itself fairly imports. Liability in tort is not, of course, excluded by this contractual relation, but seems to us to be dominated by it.

▇ Turning to our own Civil Code and treating the breach here involved as essentially one arising from contract, in a case where the measure of damages is not otherwise expressly provided for, it follows that such measure of damages is "the amount which will compensate the party aggrieved for all the detriment proximately caused" by the breach "or which, in the ordinary course of things, would be likely to result therefrom". (Civ. Code, sec. 3300.) It is likewise provided by section 3301 of the Civil Code that: "No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin."

▇ It would be manifestly impracticable, by any proof of the present value of the securities in the hands of the Depositary to know whether or not the certificate holders will suffer any ultimate loss from the circumstances that the Depositary has transcended its powers. To now determine from that circumstance that they have sustained no damage and countenance an adjudication exonerating the Depositary from all responsibility for its conduct would set a precedent which, if generally followed, must lead to disastrous results. It seems to us to follow that the course pursued by the trial court was the right one. Should it appear after a fair liquidation that the certificate holders have, by reason of being paid in full, suffered no injury, the Depositary will owe them nothing more and have no ground for

complaint. If, on the contrary, a deficiency shall remain due them, the court must, from the necessity of the case, indulge the inference that it would not have occurred had the Depositary confined itself to conduct authorized by its specific powers.

The Depositary complains of various findings. One of those objected to is that no accounting was made by it prior to the trial. It is not claimed that it made any but what seems to be objected to is the supposed implication that it failed to respond to requests from certificate holders for information. We do not think that the finding carries any such implication. It objects to the finding that it failed to keep any record of securities deposited and withdrawn. It is not claimed that it kept any such record or that the finding is untrue but its claim is that it was under no duty to keep records of securities not retained by it. We do not think the finding one of which it may reasonably complain. It may be a finding not strictly necessary to the decision but its tendency is to show that the difficulty of establishing the extent, if any, to which the certificate holders have been prejudiced by its conduct, has been rendered the greater by its failure to keep any record of the substitution by the Company of some securities for others and, therefore, of the extent, if at all, to which securities deposited with it, conforming to the requirements of the Indenture, were supplanted with its acquiescence by others that did not conform thereto. The finding does not seem to us of special importance one way or the other since the audit made of the Company's books, at length, covered the situation. Objection is made to the finding that it allowed collateral nominally deposited with it to remain in the actual custody of the Company. There is a conflict in the testimony on the subject but Jackson testified that while the Company's headquarters were maintained in the same building with that of the Depositary various of these papers were so kept as to be accessible to persons such as Mr. Porter who were at the same time connected with both concerns. According to this account, when the Company's offices were later removed to another location a safe belonging to the Company in which securities deposited as collateral were kept, as well as various files pertaining to such collateral were moved, by inadvertence, to the Company's new office, though when their presence there was noticed they were returned to the Depositary.

The finding, which we must assume to be correct, is illustrative of the loose methods employed, but is not otherwise of importance. Various criticisms are made of the portions of the findings detailing the assets remaining in the Depositary's hands and their relation to those required in connection with the mortgage certificates valid and invalid authenticated by it. It is conceded by respondents that there is a transposition of figures in the court's finding 35 relative to the respective amounts of notes secured by trust deeds and Home Owners' Loan Corporation bonds now in the Depositary's hands which should read, as respects trust deeds $10,121.40, and as respects such bonds $3,425, which figures are by clerical error in fact reversed. Portions of these findings when read by themselves might be misleading but when all are read together we do not think, other than said transposition of figures, any substantial error can be said to exist in them, or that, except for such transpositions, the judgment entered shows the Depositary to have been prejudiced by any misstatement of fact contained in them.

 In the disposition of this appeal a few other matters require attention. The Depositary complains because, as between the certificate holders and itself, it has been charged in the accounting with $2,375 retained, in instalments of $50 a month for its own compensation, and $450 paid to its attorneys. The $2,375 was charged, at the monthly rate stated, for its own services subsequent to the Company's default. There is no question that under the terms of the Indenture the Company agreed to pay to the Depositary the reasonable value of its services and, subject to what are therein adjudged to be the rights of the certificate holders to be paid in full, the judgment recognizes a liability from the Company to the Depositary on that account, fixed by it at $10,000. Since the default various foreclosures of collateral have been carried out by the Depositary and its attorneys have made charges against it for legal advice in connection with its proceedings. The $450 charged back to it by the court does not represent all of the attorneys' fees disbursed by it since the default but, apparently, only such part of the amounts paid them as were not included in the ordinary routine charges for conducting foreclosures. Inasmuch as these disallowed items appear to have been reasonable in their amounts and their disbursement to have been made since the default in the necessary administration of what was,

at least after the default itself, indisputably a trust, we do not think them distinguishable from other expenditures contemplated by the judgment in the liquidation of the deposited assets. Assuming, however, that we are right in sustaining the action of the trial court in holding the Depositary liable to those held to be valid certificate holders, for any deficiency remaining in the amounts due them after the liquidation shall be completed, we cannot see that the Depositary is in anywise prejudiced by the disallowance of these items of $2,375 and $450, together aggregating $2,825. To permit the Depositary to charge them against the funds derived from liquidated assets would merely result in charging them back to the Depositary in the event that a deficiency shall appear at the conclusion of the liquidation. If no deficiency appears then the certificate holders will have been satisfied, and the sums in question can, of course, be retained by the Depositary from any remaining proceeds of the liquidation in its hands, so far as those suffice to meet them, since otherwise such remaining proceeds would belong to the Company, against which the Depositary now has its $10,000 judgment for services rendered, which so far as can be ascertained from the record, includes *inter alia* these charges which the Depositary now contends ought to be allowed out of the trust fund. We see no reason, therefore, for interfering with the trial court's disposition of those items.

Some other aspects of the judgment rendered do present difficulties. It undertakes to sanction and provide for the liquidation by the Depositary under the court's direction of all the deposited assets. As respects the Ewing contract not only has the trial court in effect found that its deposit was not validly authorized by the Company but it is patent that such deposit was made for no other reason than to secure the authorization of the Reinert certificates. The legal consequence of holding these invalid would, in ordinary circumstances, be that the transaction should be set aside as a whole and the Ewing contract returned to the Company, which is, in effect, found to have been victimized by Jackson and perhaps others of its officials, in the whole Reinert transaction, rather than to have been in a legal sense a party to it. The Ewing contract, however, is found in fact to be no asset at all but a mere sham and it would, therefore, be useless to the Company or anyone interested either as a creditor or

stockholder of the Company, to direct its return, even if the Company sought such return, which in fact it does not.

 As respects, generally, the executory contracts of sale belonging to the Company and assigned by it to the Depositary, while as we have seen, they were not such securities as were authorized by the Indenture, yet both the Company and the Depositary treated them as such and neither is in any position to complain, and neither in fact complains, of so much of the judgment as contemplates resort to them with the rest of the securities deposited to satisfy the just claims of the certificate holders.

The Company has not appealed from the judgment, nor have any of its general creditors, some of whom at least, are parties to the record. Had it or they done so, a serious question might arise as to whether the Company's notes in the respective sums of $51,015.32 and $33,412.17, with the trust deeds made to secure them ought to be regarded as any part of the assets constituting specific security for the mortgage certificates that were held valid. Their execution as we have seen was a transaction entirely outside of anything contemplated by the Indenture. It was not done in the regular course of business contemplated by the instrument but was the result of an afterthought and a mere voluntary arrangement between the Company and the Depositary. However, it was done after the Company's board of directors had been so reorganized as to include representatives of the Company's two principal general creditors and neither those nor any other general creditors of the Company are here complaining of it. So far as the Depositary is concerned, though, as we saw, its notice of appeal is from the whole judgment, its counsel expressly say that they raise no question (other than their claim of a lien in favor of the Depositary for its services) "as to the validity of the judgment . . . in so far as it declares that the holders of the valid certificates have a right to the funds and securities now in the possession of the Depositary, . . . it being admitted by the Depositary that *they* have no right, title or interest in or to the securities mentioned except under and by virtue of the agreement of October 6, 1924." We take it that, in the language quoted, in the use of the word *they* counsel really mean *it* and that the antecedent intended is the Depositary. At all events it is clear that the Depositary thus agrees that all of the assets in its hands resulting from deposits made

with it shall be treated as though the deposits had been made in strict accord with the terms of the Indenture. This is a reasonable attitude insofar as the Depositary is concerned, since, to the extent that the liquidation of these assets, including specifically the foreclosure of the trust deeds made to secure the $51,015.32 and $33,412.17 notes, results in available funds to apply to the demands of the holders of valid certificates it will diminish the probability of any deficiency payable under the terms of the judgment to them.

Complaint is made, because in determining the amounts to be paid to those found to hold valid mortgage certificates, the trial court allowed interest on all unpaid balances thereon at seven per cent per annum from December 1, 1931. It is claimed that the selection of this date was arbitrary and attention is called to the circumstance that most of the mortgage certificates provide for interest at the rate of six and one-half per cent per annum only. The interest date as provided in the certificates was March 1, 1932, but the Company paid only half of the interest for the six months ending on that day, or, in other words, only interest for the period ending on December 1, 1931. We are in agreement with the respondents that the Depositary's liability, to use again the language of Professor Pomeroy referred to in one of the above-quoted passages from *Conover* v. *Guarantee Trust Co., supra,* is a "simple contract equitable debt". Its measure, however, is the loss occasioned to the certificate holders by the breach of trust, which manifestly cannot exceed the principals of their respective certificates with the stipulated interest thereon up to the time when, had the breach of trust not occurred, they would have been paid, whether as a result of realizing on the security or otherwise. We cannot know what this date would have been had the securities deposited been confined to the classes contemplated by the Indenture. For practical purposes we think that this date should be considered as coming at the end of a time equal to that which the trial court has allowed for the actual liquidation ordered by it. We think, therefore, that the interest allowed to each holder of a certificate adjudged to be valid should, as of December 1, 1931, be reduced to the rate fixed in the mortgage certificate itself for the time during which the liquidation is allowed to continue (whether that be the four years initially contemplated by the decree or any shorter time within which the court may, by reservation of juris-

diction in the decree, hereafter require such liquidation to be confined), and that seven per cent interest should be allowed only on the deficiency as then ascertained and from that date. Since all of the certificates do not bear interest at the same rate, these details, though the record exhibits them, can best be worked out in the trial court. This, of course, will not require the taking of further evidence.

The judgment in so far as it is affected by the Reinert appeal, is affirmed. In so far as the judgment is affected by the appeal of the Depositary, Security Title Insurance and Guarantee Company, it is reversed with instructions to the trial court to render a new judgment in substance the same as that originally entered by it, except that it shall contain said corrections in the amounts of the trust deeds and Home Owners' Loan Corporation certificates respectively charged to the Depositary, and that in case of mortgage certificates bearing, according to their terms, interest at less than seven per cent per annum, the interest allowed to each of the holders of such mortgage certificates adjudged to be valid shall be reduced in accordance with the views hereinbefore expressed.

Respondents to recover costs.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 15, 1939, and an application by appellant Reinert to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 19, 1939.